**In re FRG, INC., Debtor.**

**In re FRP LIMITED PARTNERSHIP, Debtor.**

**In re FMI LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy Nos. 89–12766S, 89–12768S and 89–12769S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 14, 1991.

John P. Sirico, II, Kaye, Scholer, Fierman, Hays & Handler, New York City, for applicants.

Nicholas J. Lepore, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for creditors' committee.

Joseph A. Vogel, Hahn & Hessen, New York City, for debtors.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

The Official Committee of Unsecured Creditors ("the Committee") and the United States Trustee ("the UST") have filed Objections to an Application of John T. Hall ("Hall") and U.S. Real Estate Advisors, Inc. ("USREA") (collectively Hall and USREA are referred to as "the Applicants"), filed on November 21, 1990, in which the Applicants seek an Order granting them $85,000

pursuant to §§ 105(a), 503(b) and 507(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Bankruptcy Rules, ... for having made a substantial contribution in the Debtors' chapter 11 cases and approving a certain compromise and settlement with the Debtors....

The history of the above-captioned three bankruptcy cases can be most productively gleaned from review of a published Memorandum addressing another issue arising therefrom, reported at 121 B.R. 451, 453 (Bankr.E.D.Pa.1990). The cases involve three Debtors: (1) FRG, Inc., the corporate general partner of FRP Limited Partnership ("FRP") and FMI Limited Partnership ("FMI"); (2) FRP, the general partner of about 60 limited partnerships owning discrete apartments, office buildings, and other realty in mostly the southern United States; and (3) FMI, the holder of certain notes relevant to the partnership operations. These cases and cases of several of the limited partnerships were filed in the Southern District of New York on May 17, 1989, and transferred to this court when the Honorable Howard C. Buschman, III, granted a motion to change the venue of this case on July 28, 1989.

The Applicants burst into the proceedings in these cases on August 29, 1990, at a hearing on the propriety of the Disclosure Statement accompanying the Debtors' initial consolidated Plan of Reorganization. That Plan originally contemplated the sale of the Debtors' assets to NHP Real Estate Corp. ("NHP") for $2.35 million. USREA alleged, at that hearing, that it had offered and was willing to pay more than NHP had offered for these assets. The result of that hearing was our entry of an Order of August 30, 1990, requiring the Debtors to file Amended Disclosure Statements by September 11, 1990; requiring Objections thereto to be filed by September 21, 1990; and scheduling a hearing on the Amended Disclosure Statement on September 26, 1990.

On September 26, 1990, Hall, the "managing director" of USREA, alleging that he was the assignee of a claim of Sandler Securities, Inc. ("Sandler") against the Debtor, filed a motion seeking to reduce the Debtors' exclusivity period to allow him to file a competing Plan of Reorganization of the Debtors. We approved the Debtors' Second Amended Disclosure Statement, indicating that NHP had now increased its purchase price to $3.15 million, after the

hearing on September 26, 1990. We also scheduled a confirmation hearing on the Debtors' Plan on November 28, 1990, and we scheduled an expedited hearing on Hall's motion on October 10, 1990. On October 1, 1990, Hall filed a proposed competing Plan and accompanying Disclosure Statement featuring the sale of the Debtors' assets to USREA. On October 10, 1990, after a hearing, we entered an Order in which we sustained certain Objections to this Disclosure Statement, but allowed Hall to file an Amended Disclosure Statement by October 15, 1990; required any Objections to be filed by October 21, 1990; and scheduled a hearing on the projected Amended Disclosure Statement on October 24, 1990.

Hall's Amended Disclosure Statement never appeared. We later learned that, on October 15, 1990, counsel for Hall directed a letter to the Debtors' counsel confirming a settlement between the Applicants and the Debtors whereby the Applicants would no longer pursue a competing Plan, but would receive the sum of $85,000, "representing the fair and reasonable value" of the Applicants' "contribution made in the Debtors' Chapter 11 cases and a reasonable compromise and settlement of the presently-pending competing plan" of Hall. The Debtors' counsel endorsed his agreement to these terms on the letter, adding that the settlement was "subject to your preparation of the appropriate § 503 application."

Until the filing of the instant Application and accompanying papers on November 21, 1990, we never again heard from the Applicants. A hearing on the Application and the Objections thereto came before us on February 13, 1991. Meanwhile, the Debtors' Second Amended Plan of Reorganization, featuring the sale of assets to NHP, was confirmed without opposition on November 28, 1990.

The Applicant presented no testimony at the hearing on February 13, 1991. Since the Committee asserted an Objection to Hall's standing as a creditor to make a claim for compensation pursuant to 11 U.S.C. § 503(b)(3)(D), *see, e.g., In re St.*

*Mary Hospital,* 120 B.R. 25, 28, 30–31 (E.D.Pa.1990), we accorded the Applicants an opportunity to "designate and file any portions of the docket or the record in this case which they deem necessary to consideration of their Application" and, specifically, to "advise whether an assignment of any claims to them was approved by the court," as well as an opportunity to file a Brief in support of their position, by February 22, 1991. The Objectors were given until March 1, 1991, later extended by agreement to March 6, 1991, to reply to the Applicants' submissions.

In addition to submitting a "Supplemental Letter Memorandum in Support of Agreement," the Applicants' counsel filed, on February 22, 1991, a "Certificate" asserting that certain "claim transfer papers" relating to the Sandler claim were filed by Hall with this court on September 26, 1990. However, allegedly because the papers were lost in the Clerk's office, no notice of the proposed assignment of the claim, as required by Bankruptcy Rule ("B.Rule") 3001(e)(2), had been dispatched, nor had any order approving the assignment been entered. Moreover, the "claim transfer papers" reveal that, despite the alleged assignment of the claim, all distributions payable to Sandler in the cases would in fact be paid to Sandler except for $5,000, representing Hall's "purchase price" for the claim.

 It is clear to this court that, in this era of heightened scrutiny of transfers of claims, *see e.g., In re Ionosphere Clubs, Inc.,* 119 B.R. 440 (Bankr.S.D.N.Y.1990); *In re Allegheny, Inc.,* 118 B.R. 282, 286–304 (Bankr.W.D.Pa.1990); *In re Revere Copper & Brass, Inc.,* 58 B.R. 1 (Bankr.S. D.N.Y.1985); C. Fortgang & T.M. Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L.REV. 1, 38–42 (1990); and D. Heimen & S. Riley, *Are Vulture Investors Changing the Face of Chapter 11?,* 2 FAULKNER & GRAY'S BANKR.L.REV. 5, 6–7 (No. 3, Fall, 1990), Hall's unconsummated filing of "claim transfer papers" does not vest him with the standing of a creditor in this bankruptcy case. As the foregoing

authorities indicate, an assignment of a claim must be approved by the court before the assignee becomes a "creditor." There is considerable doubt in our mind as to whether the assignment in issue was sufficiently "unconditional" that it would have been approved over apparent objections. *See Ionosphere Clubs, supra,* 119 B.R. at 443–45. We are certainly not prepared to approve it *nunc pro tunc,* as would be necessary for Hall to attain the status of a "creditor" of the Debtors at this juncture.

■ Therefore, it is rather apparent that the Applicants neither are nor were "creditors" of the Debtors. Consequently, any claim on their part for compensation based upon § 503(b)(3)(D) must indeed fail on the basis of the reasoning in *St. Mary Hospital, supra,* 120 B.R. at 28, 30–31. *Cf. In re Beck–Rumbaugh Associates, Inc.,* 84 B.R. 369, 371 (E.D.Pa.1988).

Perhaps in recognition of the significance of the deficiency of their lack of creditor-standing to any claim under § 503(b)(3)(D), the Applicants emphasized, at the hearing on February 13, 1991, and in their post-hearing submissions, two alternative bases in support of their Application. Firstly, they contended that their Application was based upon B.Rule 9019, not § 503(b)(3)(D). Secondly, they asserted that they were entitled to compensation under a residuum of the power of this court to allow administrative claims not within the specific categories outlined in § 503(b) in light of the "severe and outrageous form of prejudice and injustice" which would befall them if they were frustrated in their apparent expectation that the alleged benefit which they conferred upon the Debtors' estate would be compensated.

■ As to invocation of B.Rule 9019, we acknowledge that, generally, the Debtors' settlement with the Applicants, which the Debtors have not disavowed, would be enforced as long as it fell above a low threshold in the range of reasonableness. *See, e.g., In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 390, 395–96 (Bankr.E.D.Pa.1987). However, it is well-established that the task of measuring appropriate compensation of professional per-

sons from the funds in a debtor's estate is one which a bankruptcy court can never delegate, even to the debtor or to the UST. *See, e.g., In re Patronek,* 121 B.R. 728, 730 n. 4 (Bankr.E.D.Pa.1990). Fee applications are therefore always subject to court review, even in the absence of any objections thereto. *See, e.g., In re Reader,* 845 F.2d 1014 [Table] (3d Cir.1988) (unpublished Memorandum Opinion, slip op. at 2–3); *In re Metro Transportation Co.,* 107 B.R. 50, 53, 54 (E.D.Pa.1989); *In re National Paragon Co.,* 87 B.R. 11, 13 (E.D.Pa.1988); *In re J.A. & L.C. Brown Co.,* 75 B.R. 539, 539–40 (E.D.Pa.1987); and Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 255 (1985).

■ Moreover, here, there *were* objections to the Applicants' request for compensation, by both the UST and the Committee. The Debtors, in agreeing to the terms of the settlement, put the Applicants upon notice of their need to submit their request to interested parties and the court for approval, by referencing the preparation of an application pursuant to § 503 of the Code as a condition to their approval of the settlement terms. Therefore, clearly, in this context, this court must independently approve the Applicants' request for compensation before it can be granted, irrespective of the Debtors' concurrence in its merit.

■ Since § 503(b)(3)(D) is foreclosed to them, the Applicants are forced to rely upon the general residuum of 11 U.S.C. § 503(b)(1)(A) and the equitable powers of this court under 11 U.S.C. § 105(a) as statutory bases for their Application. Section 503(b)(1)(A) provides as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; ...

We will accept the Applicants' basic premise that the presence of the word "in-

cluding" in § 503(b) precludes the conclusion that the categories of types of claims set forth in that Code section are exclusive. *See, e.g., In re Chateaugay Corp.*, 115 B.R. 760, 771 (Bankr.S.D.N.Y.1990). However, it is equally well-established that administrative claim priorities are to be "narrowly construed" and that the burden of demonstrating that particular services were actual and necessary to preserve the debtor's estate "rests with the claimant." *Id.* at 771, 772. *See also, e.g., In re Philadelphia Mortgage Trust*, 117 B.R. 820, 825–28 (Bankr.E.D.Pa.1990); *In re Leedy Mortgage Co.*, 111 B.R. 488, 491 (Bankr.E.D.Pa. 1990); and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897 (Bankr.E.D.Pa.1987).

■ In light of the careful eye with which a bankruptcy court is required to view fee applications generally, it is difficult to argue that a category of professional fees and costs not expressly enumerated within § 503(b) is entitled to consideration. The only example of an instance in this category cited by the Applicants relates to the issue of the payment of compensation to members of creditors' committees, an issue concerning which puzzling Code draftsmanship and legislative history has created a wide divergence of opinion. *Compare In re George Worthington Co.*, 921 F.2d 626 (6th Cir.1990); and *In re J.E. Jennings, Inc.*, 96 B.R. 500 (E.D.Pa.1989), *with In re George Worthington Co.*, 913 F.2d 316, *vacated*, 921 F.2d 635 (6th Cir. 1990); and *In re J.E. Jennings, Inc.*, 67 B.R. 106 (Bankr.E.D.Pa.1986), *rev'd*, 96 B.R. 500 (E.D.Pa.1989). We would therefore be inclined to grant compensation to professionals not within the confines of the specific provisions of § 503(b) in only cases where the right to such compensation is arguably justified by the Code—or where the benefits flowing to the estate from a professional's services are clearly manifested.

■ This is not such a case. As the Committee points out in its post-hearing Brief, the burden of proving that the Debtors' estate benefitted from the Applicants' services was squarely upon the Applicants.

Nevertheless, the Applicants presented virtually no evidence in support of this assertion, relying instead upon out-of-court affidavits and certifications and the use of hyperbolic adjectives in submissions to the court, *see* page 657 *supra*, to make their "record."

■ The criteria which must be satisfied to allow a recovery under § 503(b)(3)(D) are that the services for which compensation is sought must have benefitted the estate itself or all parties in the case; must have had a direct, significant, and demonstrable positive effect upon the estate; and must not have been duplicative of services performed by others. *See, e.g., In re Washington Lane Associates*, 79 B.R. 241, 243–44 (Bankr.E.D.Pa. 1987); *In re Paolino*, 71 B.R. 576, 579–80 (Bankr.E.D.Pa.1987); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 565–69 (Bankr. D.Utah 1985); *In re Richton International Corp.*, 15 B.R. 854, 855–56 (Bankr.S.D. N.Y.1981); and G. Johnson, *Recovering a Creditor's Expenses and Legal and Accounting Fees as an Administrative Claim*, 5 BANKR.DEV.L.J. 463, 483 (1988). If these criteria cannot be met by the Applicants, then surely they should not be able to recover any compensation, since they would be parties *outside* of even the specific purview of § 503(b)(3)(D).

■ The Applicants have not proven that they satisfy the § 503(b)(3)(D) criteria. As the Committee points out in its Brief, the Applicants appear to contradictorily claim that the Debtors' estates were benefitted by both the whirlwind commencement of the Applicants' activities in this case *and* the abrupt cessation of these activities. There is no ambiguity, however, as to what triggered the Debtors' agreement to support the Applicants' receipt of $85,000 in compensation. It was clearly the cessation of their activities that prompted this.

If the Applicants' participation in the bidding to acquire the Debtors' assets was as much a benefit as they contend, then clearly the triggering event of the Debtors' stipulation—the cessation of these activi-

ties—was arguably, if anything, a detriment to the Debtors' estates.

Our observations at the hearings in August and September, 1990, verified the Committee's allegations that the efforts of the Debtors and Committee to stimulate bidding for the Debtors' assets was the most direct causative factor for the ultimate increment in the amount of NHP's purchase offer. The presence of USREA, and the presence of the other prospective purchasers, were obviously necessary instruments to the successful bidding process. However, it is difficult to argue that USREA, as a mere instrument in the process, could be found to have acted primarily for the benefit of the Debtors' estate in its participation. Rather, it is apparent that the Applicants were acting primarily on behalf of their own interests as one of the potential purchasers of the Debtors' assets in participating in the bidding process and in pressing that participation to the point of injecting themselves into the administration of this case. Thus, any benefit to the Debtors' estates flowing from these activities was purely incidental.

Therefore, we conclude that the benefits derived by the Debtors' estates as a result of the Applicants' activities were incidental, had at best an indirect positive effect on their estates, and were part and parcel of "services" provided by the combined actions of other prospective bidders and (primarily) the parties who set the stage for the bidding process, the Debtors and the Committee, rather than by USREA itself. Consequently, even were the Applicants classifiable as creditors under § 503(b)(3)(D), they would not have demonstrated their right to compensation from the Debtors' estates.

■ Section 105(a) of the Code, also invoked by the Applicants, is of little benefit to their cause.

§ 105(a) cannot be utilized "as a justification for our proceeding to take otherwise doubtfully authorized judicial actions," *In re Telephonics, Inc.,* 85 B.R. 312, 318 (Bankr.E.D.Pa.1988), or " 'as a loose cannon ... to support otherwise insupportable claims.' " *In re University Medical Center,* 82 B.R. 754, 758 (Bankr.E.D.Pa. 1988) (quoting *In re Latimer,* 82 B.R. 354, 364 (Bankr.E.D.Pa.1988)).

*In re Amatex Corp.,* 97 B.R. 220, 225 (Bankr.E.D.Pa.), *aff'd,* 102 B.R. 411 (E.D. Pa.1989). *See also Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988); and *In re Morristown & E. R.R.,* 885 F.2d 98, 100 (3d Cir.1989). The lack of any justification in the Code for granting the Application prevents the invocation of § 105(a) to support it.

■ However, we must add that we are not impressed with the argument that overwhelming equities support the Applicants' position, either. The sudden appearance and subsidence of the Applicants as players in these cases suggest that their labors on the purported behalf of the Debtors may have been posturing towards the selfish end of persuading the Debtors to accept their offer of purchase and then exacting the $85,000 from the Debtors as a "price" to "buy off" the annoyance of a presence which had otherwise outlived its usefulness. We believe that it would be "outrageous" and "unjust" to *reward* parties who have sufficient strength and presence to disrupt a bankruptcy case with "protection money" as a price for their silence. The inability of a debtor to resist the temptation to sacrifice what is largely creditors' money as a consideration to quiet parties potentially disruptive of the process of administration of a Chapter 11 case cannot bind the affected creditors to the Debtors' promises to pay such parties.

We will therefore enter an Order sustaining the Objections to the instant Application.