In re LEASE–A–FLEET, INC., Debtor.

Bankruptcy No. 91–12996S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 23, 1992.

Patrick Stapleton, Rawle & Henderson, Gen. Counsel, Robert J. Vedatsky, Needle & Feldman, Sp. Counsel, Allen B. Dubroff, Astor, Weiss & Newman, Philadelphia, PA, Former Counsel, for debtor.

Michael Lubline, Fell & Spalding, Philadelphia, PA, for claimants.

Karen Lee Turner, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for Morse Operations and University Cadillac, Inc. d/b/a Lauderhill Leasing.

Robert D. Sayre, Philadelphia, PA, for Meridian Bank.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before us are the Objections of MORSE OPERATIONS, INC. d/b/a LAUDERHILL LEASING ("Lauderhill"); and a related entity, UNIVERSITY CADILLAC, INC. ("University"), (collectively Lauderhill and University are referenced as "the Objectors"), to administrative proofs of claim filed by ROBINS LE–COCQ, INC. ("Robins") (No. 26) and GGM Co. ("GGM") (No. 27) (collectively "the Claimants"). University previously purchased the secured claim

of United Valley Bank ("UVB") in this case. The Claimants are corporations related to LEASE–A–FLEET, INC. ("the Debtor"), whose claims represent expenditures incurred in propping up the existence of the Debtor during this bankruptcy case.

The claims are made pursuant to 11 U.S.C. § 503(b)(3)(D). We find that this Code section is a particularly narrowly-construed Code provision, allowing administrative claims only for extraordinary "substantial contributions" to a case by creditors. Moreover, the scope of administrative claims is generally narrowly construed.

Because we believe that the Claimants' expenditures can be analogized to a resuscitator attached to the clinically-dead Debtor, principally for the benefit of the Claimants themselves and secondarily for the benefit of mostly members of the family of the Claimants' owners, the Objections to the classification of these claims under the very narrow category of § 503(b)(3)(D) claims will be sustained.

## B. PROCEDURAL AND FACTUAL HISTORY

To describe this bankruptcy case as over-litigated would be an understatement. The protagonists of most of the litigation are, on one hand, the Wolk family, the owners of the Debtor; and Lauderhill on the other. The Debtor was formerly an intermediate lessee of vehicles supplied by Lauderhill and a lessor of these vehicles in turn to small companies mostly located in Florida renting directly to consumers. When the pile-up of participants to this dispute is unravelled, the Wolk family and Lauderhill are (again) predictably at the bottom. Because these parties (or at least Lauderhill) have refused mediation and ignored the supplications of this court to avoid the wastefulness of the resources of the parties and the courts in litigation; and the district court has stayed the confirmation process, which might have brought this matter to a conclusion, this process continues and proliferates unabated. The instant claims and the objections thereto are not only subjects of, but also are products of, this litigation.

The litigation previously generated by this case has produced several published Opinions in which the detailed history of this case has been chronicled since its filing on May 30, 1991, and need not be repeated except where necessary to an understanding of the matter before us. In the first published Opinion, *In re Lease–A–Fleet, Inc.*, 131 B.R. 134 (Bankr.E.D.Pa.1991) ("*LAF I*"), aff'd in part & rev'd in part, 141 B.R. 63 (E.D.Pa.1992) ("*LAF II*"), aff'd, 92–1402, 983 F.2d 1051 (3rd Cir., Dec. 14, 1992), we considered the allocation of certain post-petition payments received by the Debtor between the Debtor; Lauderhill; the Debtor's two secured creditors, Meridian Bank ("Meridian") and UVB (now replaced by University).

In *In re Lease–A–Fleet, Inc.*, 140 B.R. 840 (Bankr.E.D.Pa.1992) ("*LAF III*"), we considered administrative claims of Lauderhill for its leased vehicles utilized by the Debtor post-petition. We note that *LAF III* was not totally resolved because of the pendency of a trial before a district jury in three consolidated lawsuits between, predictably, the Debtor and the Claimants and their principals on one hand and Lauderhill on the other ("the District Court Litigation"). That trial ended in a jury verdict of July 2, 1992, which would have awarded the Debtor over $3 million. However, post-trial motions have been filed and no judgment has been entered.

In *In re Lease–A–Fleet, Inc.*, 141 B.R. 853 (Bankr.E.D.Pa.1992) ("*LAF IV*"), we entered a judgment in favor of the Debtor against Lauderhill in the amount of $850,-055.53 in a preference action. This action is on appeal and has been stayed by the district court. Finally, in *In re Lease–A–Fleet, Inc.*, 141 B.R. 869 (Bankr.E.D.Pa. 1992) ("*LAF V*"), we denied Lauderhill's attempt to substantively consolidate Robins, a non-debtor, with the Debtor's case.

More litigation remains on the horizon. There is an outstanding preference and fraudulent conveyance action against Meridian scheduled for trial on January 21, 1993, in which Lauderhill has intervened and taken up the laboring oar. Also, taking our cue in *LAF V* that the preferred

manner of Lauderhill's challenging alleged preferences to Robins was not substantive consolidation with this case, but obtained permission to file preference actions against that entity on the Debtor's behalf, Lauderhill has filed preference and fraudulent conveyances actions against not only Robins, but also GGM, and a third entity owned by the Wolk family. These actions are listed for trial on January 6, 1993. Also listed on that date is a request by the Debtors' general counsel, Rawle & Henderson ("Rawle"), and its special counsel, Needle & Feldman ("Needle"), to obtain interim payments on allowed fees of about $300,000 out of about $750,000 cash which the Debtor has on hand. An Order allowing those firms to share $50,000 out of a requested $200,000 was met with a blizzard of protestive pleadings from Lauderhill, which obviously would prefer the pauperization of the Debtor's thus-far effective opposing counsel. We shudder to consider the dollars spent (or wasted, we would say) by Lauderhill in the course of this death-struggle with the Wolks.

Getting back to the dispute at hand after putting it into the perspective of this case, we start by noting that, on April 30, 1992, the bar date established by this court for filing administrative claims, Robins and GGM filed the claims at issue, seeking repayments as administrative expenses for what they termed "money loaned" to the Debtor to continue its operations. The Claimants are corporations owned by Donald Wolk ("Donald") and Beryl Wolk, the former owners of the Debtor and not incidentally the father and uncle, respectively, of Steven Wolk ("Steven"), the present owner and president of the Debtor. Both Claimants and Donald are guarantors of loans and various debts owed by the Debtor to Lauderhill and Meridian. In addition, the Claimants and Donald are parties to the District Court Litigation.

The Claimants originally requested payments in the amounts of $228,295.66 (Robins) and $86,782.00 (GGM). Their Claims recited the following categories of expenses:

Robins
Payroll [1]

|  |  |
| --- | --- |
| October 1, 1991—December 31, 1991 | $ 50,093.74 |
| January 1, 1992—April 30, 1992 | 56,769.80 |
| Payroll Taxes | 16,650.76 |
| TOTAL | $228,295.66 |

| Employee Welfare Benefits [1] | 9,615.01 |
| --- | --- |

Operating Expenses

|  |  |
| --- | --- |
| Rent (September, 1991—April, 1992) | 31,416.85 |
| Insurance | 6,999.30 |
| Fax, Copying, Telephone | 18,820.00 |
| Cash Disbursements [2] | 18,197.92 |
| Purchases [3] | 19,832.28 |

1. The payroll and benefits were paid to Steven, the Debtor's President; David Mallenbaum ("Mallenbaum"), the Debtor's Vice–President and General Counsel and Donald's son-in-law; Gerald Monagle ("Monagle"), LAF's controller; and secretarial staff and support staff in Florida, from September, 1991, through April 30, 1992. The amount of time expended by the employees was allegedly pro-rated between activities performed on behalf of the Debtor and other related entities.

2. This category included such items as payments for paging service, computer repairs, overnight delivery services, medical insurance premiums for Monagle, long distance telephone costs, and cellular telephone services.

3. This category included payments to Corestates Bank and Marine Midland Banks, Mobile Oil, Sunoco Oil and reimbursements to Steven and Mallenbaum. These expenses were mainly incurred in connection with discovery in Florida for (mostly) the District Court Litigation. Included are expenses for airline travel, lodging, meals, entertainment, parking, and gasoline for these parties.

GGM

Reimbursable Guarantor Expenses

| | | |
|---|---|---|
| Legal Expenses [4] | $ | 6,000.00 |
| Interest Expenses [5] | | |
| June 1—December 31, 1991 | | 73,652.81 |
| January 1—April 30, 1992 | | 69,723.86 |
| Operating Expenses | | |
| Payroll (September, 1991) | | 12,515.65 |
| Payroll Taxes | | 4,904.73 |
| Mary Rose Ryan | | 2,302.00 |
| Miscellaneous Expenses [6] | | 11,621.15 |
| TOTAL | $ | 180,720.20 |

---

Objections to the Claims were originally filed by the Debtor and Needle, as well as by Lauderhill and University. It is apparent that Rawle and Needle have an interest in reducing administrative claims, as they may have to share an administrative claims "pot" with other such claimants. If the successes in the District Court Litigation and *LAF IV* are undermined by the district court (or in the inevitable appeals), there may not be sufficient funds to pay all such claimants. Moreover, Rawle and Needle are starved for cash, since their successes on behalf of the Debtor have not been consummated with final decisions or payments. On the other hand, it is apparent to us that Rawle and Needle cannot bite too hard on the hand of Wolk family entities, whose decision to hire them is the basis for their ultimate feeding.

A hearing on the Objections was scheduled on October 14, 1992. At the outset of the hearing, both Robins and GGM advised the court that, in response to the Objections, certain portions of their claims would be withdrawn. GGM withdrew $63,903.00 of its claim (expenses for litigation and interest payments) and sought leave to recast $86,782.00 from an administrative expense to a subrogation claim under 11 U.S.C. § 509. This resulted in the reduction of GGM's claim from $180,000 to $29,589.00. Similarly, Robins withdrew $27,636.02 from its claim of $228,395.00 (expenses for telephone, operating expenses

and reimbursements to employees for gas and parking), decreasing its administrative claim to $200,759.00.

In support of their claims, as reduced, Robins and GGM were first prepared to present the testimony of the custodian of their records, Helen Humphreys ("Humphreys"); Monagle; and Mallenbaum. The parties stipulated to the proposed sole testimony of Humphreys that the books and records submitted by Robins and GGM were true and correct copies which accurately reflected transactions recorded by them.

Monagle then testified regarding the post-bankruptcy operations of the Debtor and the activities and responsibilities of its employees. He stated that, subsequent to the developments in July, 1991, when Lauderhill obtained relief from the stay to recover the vehicles leased by it to the Debtor to run its business, *see LAF III, supra,* 140 B.R. at 847–48, the Debtor's operations consisted primarily of efforts to collect outstanding debts and pursuit of legal actions against the Debtor's former customers and Lauderhill. He further indicated that, following the bankruptcy filing, his services to the Debtor were reduced and that he provided more services to other affiliated Wolk-owned entities, such as the Claimants. Monagle's post-bankruptcy duties on behalf of the Debtor were described as of compiling and documenting outstanding accounts receivable and information to assist

---

4. These payments were made to Needle in connection with nonbankruptcy litigation.

5. This entry included interest payments made on account of loans in which the Debtor served as guarantor.

6. This entry included such items as computer cables and office supplies.

Rawle and Needle in the Debtor's various pieces of litigation, notably the District Court Litigation.

Mallenbaum testified that he had prepared the documentation for the two administrative claims and that the figures were derived from the Claimants' business records. Upon review of the claims, Mallenbaum concluded that an adjustment for "guarantor type" expenses was required, which resulted in the above-referenced reductions to the two claims. Further reductions were also made to employees' salaries to reflect the allocation of work performed for the Debtor and its related entities. Mallenbaum also testified that his duties at the Debtor were reduced and that his efforts were devoted to other Wolk-owned entities, principally Robins. In addition, Mallenbaum stated that the present business of the Debtor, which his efforts assisted post-petition, was the pursuit of legal claims against the Debtor's former suppliers and customers and Lauderhill.

Similarly, Steven testified that his post-petition efforts on behalf of the Debtor consisted primarily of litigational support. He also admitted that most of his recent efforts were devoted to the formation of new car-leasing entity.

Following the testimony of Claimant's witnesses, both the Debtor and Needle withdrew their objections, stating that their objections had been resolved by the reductions made by the Claimants. We view this posture of the Debtor and Needle as a statement of a negotiated resolution between the Claimants and their own hired counsel, who, as noted above, are compelled to share the administrative claim "pot" with their employers. Not surprising, Lauderhill was not a party to the resolution. At the close of the hearing, the matter, by Order of October 15, 1992, was continued until October 21, 1992, to permit the Objectors to recall Monagle as a witness and submit evidence in support of their objections. The Order also required the parties to submit post-trial Briefs by November 20, 1992 (Claimants), and December 7, 1992 (Objectors), respectively.

On the date of the scheduled supplemental hearing, the Claimants and the Objectors submitted a stipulation in lieu of a hearing, reciting principally that the Claimants had not requested court approval of the payments made by them on the Debtor's behalf.

## C. DISCUSSION

### 1. THE EXPENDITURES AT ISSUE WERE NOT LOANS, BUT RATHER WERE "IN–KIND" SERVICES WHICH MAY BE CONSIDERED AS ADMINISTRATIVE EXPENSES UNDER 11 U.S.C. § 503(b)(3)(D).

■ Initially, in response to one of the Objectors' arguments, we must determine whether the expenditures at issue were administrative expenses or loans from Robins and GGM to the Debtor. The Objectors contend that, if the advances were loans, as the claims state, then 11 U.S.C. § 364(b) required the Claimants to obtain prior court approval as a condition of their repayment from the Debtor's estate. *See In re Massetti,* 95 B.R. 360, 364 (Bankr. E.D.Pa.1989). Although the Claimants designated the bases of their administrative claims as "money loaned," they now argue in their Brief that the expenditures were not loans, but were the providing of "services" to the Debtor. We find that, despite the Claimants' characterization of the transactions as "loans," the expenditures made by the Claimants do not actually constitute "loans" for several reasons.

Firstly, the relationships between the Claimants and the Debtor do not satisfy the traditional definition of "loans." A "loan" is defined as

[a] lending. Delivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it with or without interest.

BLACK'S LAW DICTIONARY 844 (5th ed. 1979). No evidence was presented by the parties that (1) the Claimants delivered any monies to the Debtor; (2) the Debtor received any money from the Claimants; or (3) the Debtor agreed, either orally or in writing, or either expressly or implicitly, to repay any sums to the Claimants. To the contrary, the sums paid by the Claimants were paid directly to third party-payees.

Secondly, the mere designation of the payments as "loans" in the claims does not transform them into loans. In *In re Retsod, Inc.*, 99 B.R. 499 (Bankr.M.D.Ga.1989), the court addressed a somewhat analogous issue. There, the purchaser of debtor's assets applied for allowance of administrative expenses for delinquent wages which it had paid to the debtor's employees. The purchaser required each of the employees to execute an agreement that the payment was a "loan advance." The debtor objected to the purchaser's receiving an administrative claim, arguing that the payments were a "loan" between the purchaser and the employees. The court rejected the debtor's argument, holding that

> [a]lthough the letter does make reference to a "loan", the use of the word "loan" is not controlling. The law does not require the use of magic words. The Court is also mindful of the fact that the priority status attaches to the claim itself, not to the claimant (footnotes omitted).

*Id.* at 503.

The reasoning advanced by the court in *Retsod* is applicable here. The use of the word "loan" by the Claimants in their claims is not controlling. Rather, we must look to the facts involved to determined the status of the claims. As discussed above, the facts do not indicate that the payments were loans. Rather, they reveal that the Claimants paid for the provision of in-kind services to the Debtor, including the services of employees whose salaries were being paid by the Claimants, and the use of Claimants' building and facilities. Accordingly, we find that the payments in issue were not loans subject to 11 U.S.C. § 364, but were in fact the provision of in-kind services to the Debtor, allowable (or not allowable) under § 503(b). We therefore turn to the relevant issue of whether the claims are allowable as administrative expenses under § 503(b).

2. THE CRITERIA FOR ALLOWANCE OF ADMINISTRATIVE CLAIMS UNDER § 503(b)(3)(D) IS VERY DEMANDING.

■ As discussed in our decision in *LAF III, supra,* 140 B.R. at 844–45, the purpose of allowances of administrative expenses is to encourage a debtor's creditors and other parties to continue to provide services which will aid the debtor in a successful reorganization. This purpose must, however, be balanced with another bankruptcy policy which is "to provide creditors with an equal distribution of a debtor's resources." *Id.* at 844. Consequently, any requests for administrative expenses are "narrowly construed." *Id.* And, since requests for administrative priorities must be "narrowly construed," the criteria for determining whether such treatment should be afforded is demanding. *Id.* Courts making such a determination have considered, initially, whether the claim was in consideration for funds or services which were "beneficial" to the estate. *Id.* at 844–845. *See also In re Philadelphia Mortgage Trust,* 117 B.R. 820, 826–28 (Bankr. E.D.Pa.1990).

■ In their Brief, the Claimants rely solely on 11 U.S.C. § 503(b)(3)(D) as the basis for the administrative status of their claims. Since the claims arise post-petition, they are allowable against the Debtor's estate only as administrative claims. *Philadelphia Mortgage Trust, supra,* 117 B.R. at 828–30. And, since the Claimants must meet the burden of proving their entitlement to administration claim status, *id.* at 827, we are not inclined to consider any bases for administrative classification of these claims beyond those statutory bases which are expressly invoked by the Claimants.

The Bankruptcy Code, at 11 U.S.C. § 503(b)(3)(D), provides as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> .    .    .    .    .
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> .    .    .    .    .

(D) a creditor, an indenture trustee, an equity security holders, or a committee represent creditors or equity holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title....

In order to recover an administrative claim under this provision, a claimant must be a "creditor" of the Debtor and must provide a "substantial contribution" to the Debtor's estate. *See In re St. Mary Hospital,* 120 B.R. 25, 28, 30–31 (E.D.Pa.1990), *aff'd,* 931 F.2d 51 (3rd Cir.1991); and *In re FRG, Inc.,* 124 B.R. 653, 657 (Bankr. E.D.Pa.1991). Here, there is no dispute that the Claimants are creditors of the Debtor. However, a substantial issue remains as to whether the Claimants provided a "substantial contribution" to the Debtor's case, within the meaning of that term as defined by the applicable case law.

We must begin our analysis of § 503(b)(3)(D) by noting that

"[a]pplications for allowance of administrative expenses under section 503(b)(3)(D) and (4) must be carefully scrutinized. Such applications are filed after the fact, that is, after the services have been performed or the expenses have been incurred, and without prior approval, and in many instances, without the court's knowledge...."

*In re Washington Lane Associates,* 79 B.R. 241, 243 (Bankr.E.D.Pa.1987), quoting *In re Saroca Corp.,* 46 B.R. 533, 535 (Bankr.D.Me.1985).

The term "substantial contribution" is not defined in the Code. However, courts addressing the issue of "substantial contribution" under § 503(b)(3)(D) have applied several criteria. They include the requirements that the services provided (1) "foster[ed] and enhanced, rather than retard[ed]' or interrupt[ed] the progress of reorganization," *In re Ace Finance Co.,* 69 B.R. 827, 828–29 (Bankr.N.D.Ohio 1987). *Accord, In re Calumet Realty Co.,* 34 B.R. 922, 926 (Bankr.E.D.Pa.1983); (2) "conferred a significant and demonstrable benefit to the debtor's estate and to the creditors," *In re Consolidated Bancshares,*

*Inc.,* 785 F.2d 1249, 1253 (5th Cir.1986), quoting *In re General Oil Distributors,* 51 B.R. 794, 806 (Bankr.E.D.N.Y.1985); and *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557,. 569 (Bankr.D.Utah 1985); and (3) "had a demonstrable positive effect upon the estate." *FRG, supra,* 124 B.R. at 658.

In *In re Humphrey's Pest Control Co.,* 1990 WL 191859, slip op. at *2 (Bankr. E.D.Pa.1990), *aff'd,* 1991 WL 136195 (E.D.Pa. July 18, 1991), we addressed the criteria for determining whether a claimant had made a "substantial contribution" to the debtor's estate within the meaning of that term as it applies to Section 503(b)(3)(D) thusly:

The criteria for recovery under § 503(b)(3)(D) are that the services performed for which compensation is sought must have benefitted the estate itself or all parties in the case; must have had a direct, significant, and demonstrable positive effect upon the estate; and must not have been duplicative of services performed by others. See [*G.*] *Johnson,* ... [*Recovering a Creditor's Expenses and Legal and Accounting Fees as an Administrative Claim,*] 5 BANKR. DEV.L.J. [463,] at 483 [ (1988) ]. *See also Washington Lane, supra,* 79 B.R. [241,] at 243–44; *In re Paolino,* 71 B.R. 576, 579–80 (Bankr.E.D.Pa.1987); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 565–69 (Bankr.D.Utah 1985); and *In re Richton International Corp.,* 15 B.R. 854, 855–56 (Bankr.S.D.N.Y.1981).

*Accord, FRG, supra,* 124 B.R. at 658.

In addition to the general criteria discussed above, courts considering the issue of "substantial contribution" under § 503(b)(3)(d) have noted several special factors which will preclude the allowance of. such claims. One of these factors is when the payments made by a claimant are in its own "self interest." Self-interest is found to exist where the expense at issue was incurred primarily for the benefit of the creditor and provided only an incidental benefit to the estate. The presence of self-interest mandates denial of a § 503(b)(3)(D) claim. *See Wolf Creek Collieries Co. v. GEX Kentucky, Inc.,* 127 B.R. 374, 379

(N.D.Ohio 1991) (expenses incurred by buyer of debtor's assets for payroll, utilities and operating expenses were primarily for purchaser's self interest of preserving the assets); *In re Leedy Mortgage Co.*, 111 B.R. 488, 492–93 (Bankr.E.D.Pa.1990) (costs of assembling debtor's records served mostly interests of creditors, not those of the debtor); and *In re C.E.N., Inc.*, 86 B.R. 303, 306 (Bankr.D.Me.1988) (expenses of insider-claimant were incurred for his own interest, since the claimant was jointly liable for taxes paid by trustee out of proceeds from sale of debtor's assets). On the other hand, expenses have been allowed under § 503(b)(3)(D) where the debtor's estate was found to be the primary beneficiary of the services and the benefits received by the creditor were only incidental. *See In re Schatz Federal Bearings Co.*, 17 B.R. 780 (Bankr.S.D.N.Y.1982) (director of Chapter 11 debtor who served the estate was granted administrative expense for cost of legal representation incurred in defense of the director's liability claim; and *Saroca Corp., supra* (expenses of stockholder/director incurred as a result of creation of new entity which purchased the assets of the debtor were allowed as administrative expenses).

■ Although a § 503(b)(3)(D) claimant must perform a service not already being performed by the debtor or other interested parties, the claimant cannot supplant the debtor's role unless it shows that the debtor is unable or unwilling to act. *See Ace Finance, supra*, 69 B.R. at 831; and *In re Rockwood Computer Corp.*, 61 B.R. 961, 965–66 (Bankr.S.D.Ohio 1986).

In assessing whether an expense is "primarily" for the benefit of the creditor or of the estate, courts have focused upon the relationship of the creditor to the estate. Courts have been very reluctant to allow administrative claims to insiders of a debtor under § 503(b)(3)(D) or otherwise. *See In re Comtec Industries, Inc.*, 91 B.R. 344, 348 (Bankr.E.D.Pa.1988) (insider stands to gain on success of his investment in a venture and should therefore be prepared to shoulder the venture's losses); *C.E.N., supra*, 86 B.R. at 306 (court finds it "obvi-

ous" that insider's contributions were to serve primarily his own ends); and *In re Patch Graphics*, 58 B.R. 743, 746 (Bankr. W.D.Wis.1986) (company related to the debtor was denied administrative expense for the cost of purchasing new machinery for the debtor where there was no showing of primary benefit to estate).

■ Administrative claims under § 503(b)(3)(D) will also be routinely denied to co-obligors with a debtor, who make payments or investments on behalf of the debtor with one eye towards reducing that party's own liability. *See Massetti, supra*, 95 B.R. at 366 (partner's request for allowance of administrative expense for costs incurred in preserving estate's assets denied because the partner acted in his "own self-interest" in reducing debts for which he was jointly liable); *In re Doug Allen Pontiac Porsche–Audi*, 47 B.R. 11, 13 (Bankr.D.S.C.1984) (payment of liabilities to which creditor was also liable as the debtor's agent found not allowable as administrative claims); and *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121–22 (Bankr.S.D.N.Y.1982) (creditor's payments which discharged its own lease obligations were not allowable under § 503(b)(3)(D)).

3. THE CLAIMANTS' PAYMENTS BENEFITTED MAINLY THEMSELVES AND THE DEBTOR'S EMPLOYEES WHO WERE MOSTLY CLOSE RELATIVES OF THE CLAIMANTS.

■ The Debtor has admittedly not been engaged in its regular business since July, 1991, and hence was not doing business throughout the period from September, 1991, at which time the Claimants began making the payments the reimbursement for which they seek administrative status. The admission of its witnesses that the Debtor's principal current business is "litigation," primarily with Lauderhill, is an admission that the Debtor exists only as a party to litigation. In other words, the Debtor is a non-operating, paper entity, whose rights and liabilities will be determined in litigation promulgated under the direction of Rawle and Needle. Its employ-

ees are needed only as gatherers of data and witnesses for trial to be conducted by their counsel. Moreover, the major trials involving the Debtor are now ended, and all that may remain are appeals, which would be maintained exclusively by counsel. Most of the remaining major litigation either is being, or in default of the Debtor doubtless would be, maintained by Lauderhill. Lauderhill apparently recognizes that any attempts on its part to assert administrative claims for its expenses in litigation on the ground that it is "helping" the Debtor would be doomed.

The only future of the Debtor in Chapter 11 is as the proponent or participant in a liquidating plan. If a liquidating plan could not be confirmed, the Debtor's case would inevitably be converted to a Chapter 7 case. In such circumstances, it is rare for a debtor to attempt to operate, let alone for any party to attempt to fund it and claim that it is operating. A functionally non-operating company could limp along or be propped up to attempt to preserve its value for sale as a going concern. However, here, there has never been a suggestion of the prospect of the sale of the Debtor as a going concern.

The Debtor has therefore been functionally dead for well over a year. It would have been dead and buried via a liquidating plan or otherwise had Robins and GGM not attached themselves to it as its life-sustaining machines. For what purpose? For whose benefit?

To reach the conclusion that a benefit has been incurred by creditors as a result of these activities, we must examine the interests of the various creditors in this case. There has never been a committee of unsecured creditors formed in this case, suggesting that the unsecured creditors are generally insignificant in amount and number and/or not terribly concerned about the outcome of the case. One exception is Lauderhill, which is largely and, to put it mildly, excessively active in this case. However, the Debtor's continued existence as its adversary hardly serves the interests of Lauderhill.

Lauderhill, in the form of University, has bought the claim of UVB, one of the Debtor's two secured creditors. Its other secured creditor, Meridian, has expressed little interest in the Debtor *per se.* Rather, its participation in this case is as a combatant in several battles of a war with Lauderhill for as large a piece as possible of the Debtor's carcass.

The other administrative creditors, *i.e.,* Rawle and Needle, are not served by the Debtor's afterlife. Their client behind the client, the Wolk family, led by Donald, is utilizing the subsidization of the Debtor as a means of siphoning off funds from the administrative pot. If the Debtor's successes against Lauderhill evaporate in post-trial motions and appeals, Rawle and Needle will be left holding the bag—and the bag will be filled with worthless remnants of the Debtor picked clean of assets and weighted down with the Claimants' administrative claims. They are hence hardly the benefactors of the Claimants' munificence.

As might be expected, the only parties served by the Claimants' actions are the Claimants themselves—and a few individuals who are closely related to the principals of the Claimants. The Claimants appear to meet the broad, functional definition of "insiders" of the Debtor. *See In re Ingleside Associates,* 136 B.R. 955, 960–61 (Bankr. E.D.Pa.1992). The success of the litigation which it is admittedly the Debtor's sole business to maintain includes members of the Wolk family, notably Donald, and entities controlled by Donald, such as Robins, as parties. In addition, Donald and the related entities, including Robins, are guarantors of the Debtor's liabilities to Lauderhill and Meridian. It is they who would be served if the Debtor is made to appear healthy and strong, even though it has passed beyond the state of being moribund. It is Donald's relatives who remain as two of the Debtor's three key employees, while the other could just as easily become a fulltime employee of another Wolk-owned entity.

The continued life of the Debtor is therefore not beneficial to what must be recognized as the continuity of the Debtor's es-

tate. The Debtor's life does not benefit any creditors except its own employees, insiders, and related entities. It is of course the prerogative of the Claimants to spend their money as they wish. However, we cannot sustain the pretense that these expenditures "substantially contribute" to the interest of any non-insider and non-related creditors of the Debtor.

The Claimants' counsel has presented a scholarly Brief which is, like a veritable law-review article on § 503(b)(3)(D), packed with citations. However, almost every case cited must be distinguished by counsel, because there is so little authority supporting any § 503(b)(3)(D) claims likened to those of the instant Claimants. Of the numerous citations accurately presented in the Brief, only three present insider (or related) entities which have succeeded in asserting § 503(b)(3)(D) claims, *In re Medical Equities, Inc.*, 83 B.R. 954 (Bankr. S.D.Ohio 1987); *Saroca Corp., supra;* and *Schatz Federal Bearings, supra.* All three have factors which clearly distinguish them from the instant claims.

In *Medical Equities,* the claimants, one of whom was an insider, made loans to the debtor to preserve the debtor's right to exercise a valuable option to purchase certain real estate. 83 B.R. at 957–58. The ability to exercise this option was valuable to all of the creditor's creditors. Nevertheless, one of the claims of the insider was reduced from about $333,000 to about $175,000, and another of his claims was subordinated. *Id.* at 967.

In *Saroca Corp.,* the insider-claimant sought reimbursement of expenses and legal fees incurred in his formulation of a new entity to purchase the strife-torn debtor. 46 B.R. at 534. Although the reimbursements of expenses were allowed, the legal fees were denied because the court found that they were incurred principally to preserve the claimant's own intellectual property in the enterprise. *Id.* at 536.

*Schatz Federal Bearings* involved a claim of directors of a liquidated corporation for modest compensation for their services. The claims were allowed, but under 11 U.S.C. § 503(b)(1)(A) rather than

§ 503(b)(3)(D). *But see Philadelphia Mortgage Trust, supra.*

As we noted at pages 427–429 *supra,* the preservation of the Debtor cannot be justified by the need to preserve its assets or to prepare it for a subsequent sale of its assets, as in *Medical Equities* and *Saroca Corp.,* respectively. The modest allowances to the *Schatz Federal Bearing's* directors for services actually performed for the debtor bear little in common with the Claimants' attempt to recoup large expenditures made almost exclusively for their own benefit.

4. **THE SPECIFIC PAYMENTS OF THE CLAIMANTS FOR SALARIES AND EXPENDITURES SUCH AS THE DEBTOR'S RENT CANNOT BE JUSTIFIED.**

█ Finally, we are obliged to add some comments regarding specific expenditures funded by the Claimants for which reimbursement is sought. By far, the largest of these is for salaries and fringe benefits paid to, and reimbursements of expenditures by, the Debtor's employees.

The Claimants assert that the payment of these claims constituted a "substantial contribution" to the Debtor by enabling it to (1) recover outstanding rental payments from former customers; (2) obtain the information necessary to formulate a disclosure statement and plan; (3) prosecute its claims against Lauderhill in the District Court Litigation and obtain the jury verdict against Lauderhill; and (4) recover the $850,053 preference judgment in this court in *LAF IV* against Lauderhill.

However, we find that the Claimants failed to prove that the employees' efforts were not duplicative of services performed by others and that these payments were primarily for the benefit of the estate. Rather, the testimony of Steven, Monagle, and Mallenbaum established that the efforts of the "employees" to recover monies from former customers resulted in a loss to the estate, since the collection cost (salaries and employee related expenses in excess of $162,000) clearly exceeded the amounts recovered ("tens of thousands" of dollars).

Furthermore, the payment of employees' salaries by the Claimants deprived creditors of an opportunity to object to the amount and necessity of the compensation. Local Bankruptcy Rule ("L.B.R.") 4002.1 requires that, if a debtor wishes to compensate its own corporate officers, like Steven and Mallenbaum and perhaps Monagle as well, notice and an opportunity to object thereto must be provided to all creditors. To allow the Claimants to proceed to make these payments of compensation to officers without notice and then recoup same as administrative claims would permit the Debtor to circumvent the requirements of L.B.R. 4002.1 and deprive its creditors of an opportunity to object to same.

Moreover, our observation of the services provided by Steven and Mallenbaum leads us to conclude that their regular employment has been largely duplicative of the duties required to be perform by the Debtor's general and special counsel. Specifically, the formulation of the Debtor's Disclosure Statement or Plan were activities and duties which the Debtor's general counsel was obligated to, and did, perform. There is no evidence that the preparation of these documents required the input of Steven and Mallenbaum as "employees," as provided to the Debtor by the Claimants. Similarly, the Claimants submitted no evidence that the Debtor's counsel needed their allegedly almost "daily" assistance to prosecute and defend the various litigation in which the Debtor was involved. The estate was represented by competent counsel who were clearly capable of representing and defending the estate without significant legal assistance from Mallenbaum. Similarly, that same counsel was able to perform the necessary duties to administer the Debtor's bankruptcy case without any day-to-day input from Steven.

Moreover, the Claimants and the employees who benefitted from much of the Claimants' payments were all insiders of the Debtor. The owners of Claimants are the former owners of the Debtor; the father and uncle of the present owner; and the guarantors of virtually all of the Debtor's debts. "The closeness of the relationship" between the Claimants and the Debt-

or "is impossible to ignore." *Ingleside Associates, supra*, 136 B.R. at 961.

Our finding that the expenses "primarily" benefitted the insiders is based upon the Claimants' evidence which indicate that a significant portion, if not all, of employee salaries (including the taxes due thereon), benefits, reimbursements for airline tickets, meals, lodging, and entertainment were costs associated with the District Court Litigation. These are expenses which, for the most part, the Claimants would have been obliged to incur on their own behalfs in connection with the prosecution and defense of the District Court Litigation, since they were also parties thereto. Furthermore, to the extent that the Claimants served as guarantors on the Debtor's debts to Lauderhill, any recovery in the District Court Litigation and the preference claim would reduce the Claimants' own liabilities. *See, e.g., Massetti, supra*, 95 B.R. at 366; and *C.E.N., supra*, 86 B.R. at 306. We doubt that the Claimants proceeded any more vigorously because the Debtor was involved in this litigation than they would have on their own behalfs.

The evidence also suggests that the true beneficiaries of the expenses were individuals associated with the Debtor rather than the Debtor itself, *i.e.*, the son (Steven) and son-in-law (Mallenbaum) of Donald, the owner of both of the Claimants. The payments of the employee benefits include funds expended for insurance for four automobiles (a Lexus and Corvette for Steven and a BMW and Ford Bronco for Mallenbaum). There is absolutely no evidence that the payment of such expenses in any way enhanced, contributed, or served as a direct benefit to the estate. Moreover, there is no evidence that certain of these benefits were required to assure the assistance provided to the Debtor by Steven, Mallenbaum, Monagle, or any of the other administrative personnel whose salaries were subsidized by the Claimants. Consequently, we must find that the payments made by the Claimants were made in their own "self interest" and not in the interest of the Debtor. As such, the expenses can-

not be classified as having made a "substantial contribution" to the Debtor's estate and entitled to administrative allowance under Section 503(b)(3)(D).

The Claimants' request for reimbursement for rent, operating expenses, and other purchases must also be denied because these costs were not proven to have provided a "substantial contribution" to the estate. There was no evidence that the Debtor required the use of the office space or the telephone services provided by the Claimants. Since the Debtor was no longer operational during the period of these expenditures, there is no indication of what benefit to the Debtor these expenses provided. Further, the office space in question was leased directly by the Claimants from its landlord. The space occupied by the Debtor was not separate and apart from that of the Claimants and was accessible and able to be used by the Claimants. The Debtor, even when operational, never paid cash to the Claimants for its space. In fact, the testimony of Mallenbaum established that the space was often used by the Claimants' employees and served as primarily a storage facility for the Debtor. These uses do not appear to provide a measurable benefit to the estate after it ceased operations.

Moreover, like the expenses incurred on account of the Debtor's employee-related costs, the expenses here appear to have primarily benefitted the Claimants and the particular individual employees, not the Debtor. Payment of the rent and operating expenses by the Debtor served to offset or reduce a debt for which Robins was responsible, whether the Debtor occupied the space or not. They were therefore not incurred primarily for the benefit of the Debtor. Hence, these expenses are not allowable under § 503(b)(3)(D), since they did not provide a "substantial contribution" to the Debtor's estate.

## D. CONCLUSION

For all of the reasons set forth herein, we will enter an Order sustaining the remaining Objections to Claims No. 26 and 27 and striking these claims entirely.

## ORDER

AND NOW, this 23rd day of December, 1992, after a hearing of October 14, 1992, and on the Objections of MORSE OPERATIONS, INC. d/b/a LAUDERHILL LEASING and UNIVERSITY CADILLAC, INC. to the Administrative Proofs of Claim of Robins LeCocq Corp. (Claim No. 26) and of GGM Co. (Claim No. 27), and review of the post-trial Briefs filed by the interested parties, it is hereby

ORDERED AND DECREED that the Objections are SUSTAINED and that Claims No. 26 and No. 27 are DISALLOWED in their entireties.