**In re LLOYD SECURITIES, INC., Debtor.**

**Adv. No. 90–0985DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 21, 1994.

Robert E. Shields, Drinker Biddle & Reath, Philadelphia, PA, Trustee.

Warren Pratt, Drinker, Biddle & Reath, Philadelphia, PA, for trustee.

Richard L. Bazelon, Bazelon & Less, Philadelphia, PA, for customers.

Michael E. Don, Asst. Gen. Counsel, Washington, DC, for SIPC.

Michael T. Scott, Reed Smith Shaw & McClay, Philadelphia, PA, for certain other claimants.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The matter before this court raises issues of first impression as to whether compensation for attorney fees and costs incurred by

certain of the alleged former customers ("the Customers") of a brokerage firm liquidated under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), are recoverable and, to the extent such compensation is allowed, the extent to which the provisions of the Bankruptcy Code regarding compensation of non-appointed professional persons are relevant thereto.

We conclude that the Customers and their counsel are conceivably eligible to obtain a recovery of compensation, but only if they are able to satisfy the demanding criteria of either 11 U.S.C. § 503(b)(3)(D) or 11 U.S.C. § 506(c) of the Bankruptcy Code. This court adds the reference to § 506(c), despite the parties' failure to make mention of it, because we believe that the applicable SIPA provisions are broad enough to allow a recovery against the Securities Investor Protection Corp. ("SIPC") in the event that it has benefitted from the Customers' actions, and that SIPC would typically be the principal beneficiary of aggressive actions by customers to collect assets in a SIPA proceeding.

Applied to the instant proceeding, we find that the Customers are entitled to compensation for only those services provided in connection with their successful litigation of a Motion for Joint Administration of the instant SIPA proceeding with nineteen (19) related bankruptcy cases. These services were performed over the objection of SIPC and the SIPA Trustee, but ultimately benefitted SIPC. However, we find that the other services for which compensation is sought benefitted only or principally the Customers themselves, if anyone; were duplicative of the services performed by the Trustee; and/or, especially given the "considerable reliance" which we must place upon SIPC's recommendation that no compensation be granted, insufficiently significant to merit compensation.

## B. *PROCEDURAL AND FACTUAL HISTORY*

The issues before us arise in connection with two separate Applications for Compensation for Services Rendered filed by certain customers of a Debtor brokerage firm, LLOYD SECURITIES, INC. ("the Debt-

or"), on behalf of the Customers' counsel, the law firm of Bazelon & Less ("Bazelon").

In June, 1990, the federal Securities and Exchange Commission ("the SEC") filed a request for injunctive relief against the Debtor in the district court as a result of alleged widespread misappropriations of customers' funds by the Debtor's two principals, Michael Lloyd and Warren C. Nachmann. Justin Klein, Esquire, was appointed by the district court as the receiver ("the Receiver") for the Debtor shortly thereafter.

Robert E. Shields, Esquire, was appointed to succeed the Receiver as Trustee of the Debtor ("the Trustee") under a protective decree entered by the district court on December 27, 1990. The SEC proceeding was transferred by the district court to this court on December 30, 1990, under the above-captioned adversary number, to administer the liquidation of the Debtor.

On or about July 31, 1990, the Customers brought a class action in the local district court against the Debtor, its principals, and numerous other parties, entitled *Deamer, et al. v. Lloyd, et al.,* C.A. No. 90–5030 (E.D.Pa.) ("the *Deamer* Case"). Accurately predicting that the Debtor and its principals could not repay the money they had taken, the *Deamer* plaintiffs also sued, in that same action, various other parties involved in transactions with the Debtor.

On May 30, 1991, the Trustee filed nineteen voluntary Chapter 11 cases on behalf of Lloyd, Nachmann, and various corporate entities other than the Debtor owned and operated by them. These cases were themselves jointly administered in the case of *In re IBEX International, Inc.,* Bankr. No. 91–12986DAS, and hence are referenced as "the IBEX Cases." The Receiver was appointed as the trustee in all of the IBEX Cases rather than the Trustee, who felt that the separate appointment was necessary to avoid potential conflicts of interest.

On July 19, 1991, the Customers filed a motion seeking to jointly administer the IBEX Cases with the Debtor's SIPA proceeding in order to save costs by preventing administrative duplication of services ("the Motion"). After a hearing of September 4,

1991, at which SIPC and the Trustee opposed the Motion, this court, in an Order reported at 1991 WL 173319 (Bankr.E.D.Pa. Sept. 5, 1991), expressed its intention to grant the Motion upon the parties' joint preparation of an Order allowing for a smooth transition in accordance therewith. Accordingly, on September 25, 1991, the Trustee was appointed as trustee in the IBEX Cases as well as the instant SIPA proceeding, and the IBEX Cases were converted to Chapter 7 cases.

Thereafter, the Trustee administered the cases with reasonable promptness. Several pieces of major litigation emerged. On December 4, 1991, in the midst of the Trustee's sales and settlements with mortgagees of various parcels of New Jersey shore properties owned principally by Lloyd or partnerships formed by him included among the IBEX Cases, the Customers objected to the Trustee's recognition of a mortgage on property owned by Peach Orchard Land Association II ("PO II"). When the Trustee refused to challenge the validity of the mortgage, the Customers proceeded to do so successfully in a proceeding reported at 1992 WL 165962 (Bankr.E.D.Pa. July 10, 1992) ("the *PO II* Case"). The PO II realty was ultimately sold by the Trustee at an auction, with an adjoining parcel, for $182,500.

On December 19, 1991, the Trustee brought suit on fidelity bonds issued by National Union Fire Insurance Co. of Pittsburgh, PA. ("National") on behalf of Lloyd and Nachmann. The Customers intervened. After this court's Recommendation, reported at 1992 WL 236162 (Bankr.E.D.Pa. Sept. 17, 1992), that summary judgment be entered in the amount of $500,000 in favor of the Trustee on the Lloyd bond was accepted by the district court, as reported at 153 B.R. 677 (E.D.Pa.1993), this matter was settled as to all matters between the parties for $595,000.

Among the principal targets of the *Deamer* litigation was Newbridge Securities, Inc. ("Newbridge"), the "clearing broker" for the Debtor in New York Stock Exchange transactions for its customers, which allegedly negligently allowed Lloyd and Nachmann to make withdrawals from customers' accounts to improperly feed their personal enterprises. Related targets were Newbridge's parent, Citibank, the drawee bank of its checks drawn to Lloyd and Nachmann; Equibank and its predecessor, Liberty Bank, the Debtor's bank which paid the checks; and Delaware Charter Guarantee & Trust Co. ("Delaware"), with which some of the Customers had entered into agreements appointing it as a trustee or custodian of certain personal and other retirement program accounts (collectively Citibank, Equibank, and Delaware are referenced as "the Banks").

The complex, multi-party nature of the *Deamer* action and several other related civil proceedings instituted in the district court in 1990 apparently caused them to become bogged down in discovery and cross-pleading. The Trustee, in order to spur resolution of the disputes with Newbridge and the Banks, who were key targets among the defendants named in the *Deamer* case, filed several new, discrete adversary proceedings in the Debtor's bankruptcy case which he believed would isolate and hopefully permit resolution of the claims against these entities.

The first of these proceedings was filed against Newbridge on June 4, 1992. On July 17, 1992, the Trustee filed a separate proceeding against the Banks. After a mini-trial on liability in the Newbridge case, in which the Customers had intervened, on August 6–7, 1992, we filed a Memorandum and Order of October 29, 1992, reported at 1992 WL 318588 (Bankr.E.D.Pa. Oct. 29, 1992), declaring that Newbridge may be liable to the Trustee; allowing the consumers to intervene in the suit against the Banks; declaring that the suit against the Banks would proceed; and scheduling a joint status/settlement conference on both proceedings. Ultimately, the Trustee settled the matters against Newbridge and the Banks for payments totalling $1.25 million.

A process for creditors to make claims against the Debtor was established by the Trustee in the SIPA proceeding. A bar date of July 31, 1991, was set. The SIPA procedure contemplates that, if a broker-dealer's estate has insufficient funds to do so, SIPC will reimburse the estate up to $500,000 cash and securities on account per customer, but no more than $100,000 per cash account. 15

U.S.C. § 78fff–3(a). Apparently a question arose as to whether SIPC would agree to reimburse the Debtor's estate in whole or even in part for many of the Customers' claims as "customer property," because there was a question as to whether the Debtor was holding cash or securities for the Customers, or whether Lloyd and Nachmann had been holding and investing customers' assets on their own behalfs. On June 16, 1992, the Customers in issue, followed by other alleged customers, became impatient with the delays in the claims process and their lack of receipt of payment, and they moved this court to order the Trustee to rule on their claims. At a hearing on this motion of August 6, 1992, the Trustee asked for one additional month to complete the process. Much was completed by that date or shortly thereafter. Ultimately, SIPC did agree to reimburse the Debtor's estate for payment of most of the Customer's claims. The only claims of which we are aware that were disallowed were claims of members of Lloyd's and Nachmann's families. The decisions to deny these claims were sustained in our rulings of September 9 and 23, 1993, on the ground that these particular claimants' funds were entrusted to Lloyd and Nachmann personally.

The claims process has therefore now been largely completed. The only matters of any substance remaining open appear to be the Applications presently before us. On March 2, 1992, Bazelon filed the first of these, an Application for compensation in the amount of $22,120.25 for services and costs in connection with this filing and prosecution of the Motion to jointly administer the Debtor's case with the IBEX Cases ("Application I"). On September 10, 1993, Bazelon filed two additional Applications, one for his services and costs in the *PO II* Case in the total amount of $38,215.31 and another for all other services in connection with the Debtor's case and the IBEX Cases totalling $259,-003.25 (these Applications are referenced as "Application II" and "Application III," respectively).

On June 14, 1993, Reed, Smith, Shaw, and McClay ("Reed"), counsel representing claimants other than the Customers in the *Deamer* Case, filed an Application in this court seeking compensation and reimbursements of costs totalling $39,764.40. On September 23, 1993, supported by SIPC's recommendation, we denied Reed's motion, stating:

> There is no right to payment of administrative claims to the Applicant under any section of 11 U.S.C. § 503(b), because these Code sections are inapplicable to a SIPA proceeding. *See In re Beck–Rumbaugh Associates,* 84 B.R. 369, 371 (E.D.Pa.1988) (§ 503(b)(3)(D) is not applicable to even a Chapter 7 case). We also are bound to place "considerable reliance" on SIPC's objection to any recovery of fees. *See* 15 U.S.C. § 78eee(b)(5)(C). Finally, our intimate knowledge of this case causes us to conclude that the services performed were of no assistance to the Trustee, but were performed solely for counsel's clients.

Reed apparently has withdrawn its appeal from this decision.

Meanwhile, Bazelon's three outstanding Applications came before us for a hearing on Objections of SIPC and the Trustee thereto on November 4, 1993. At that time, we were advised by all parties that they considered that Application II had been resolved by an award of counsel fees to Bazelon in connection with a settlement of several matters related to PO II.

Despite our receipt of voluminous supporting narrative and timesheets from Bazelon in connection with Application III, a supplemental hearing ensued. Testifying at length concerning his alleged activities was Richard Bazelon, Esquire, the Customers' lead counsel. Also testifying was Kevin Bell, Esquire, a SIPC staff attorney. Despite its lengthy submissions and a trial Brief, the substantive contents of which are described at pages 249, 250 *infra,* Bazelon was given permission to file an additional post-hearing Opening Brief on or before November 26, 1993, and a Reply Brief on or before December 23, 1993. SIPC, which had submitted a Pre-trial Brief, and the Trustee were given until December 17, 1993, to file their post-trial Briefs.

## C. PERTINENT STATUTES AND POSITIONS OF THE PARTIES

The statutory provisions under which Bazelon now makes its claims for compensation, 15 U.S.C. §§ 78eee(b)(5) and 78fff(b), provide as follows:

**78eee(b)(5). Compensation for Services and Reimbursement of Expenses**

(A) Allowances in general

The court shall grant reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred (hereinafter in this paragraph referred to as "allowances") by a trustee, and by the attorney for such a trustee, in connection with a liquidation proceeding. No allowances (other than reimbursement for proper costs and expenses incurred) shall be granted to SIPC or any employee of SIPC for serving as trustee. Allowances may be granted on an interim basis during the course of the liquidation proceeding at such times and in such amounts as the court considers appropriate.

(B) Application for allowances

Any person seeking allowances shall file with the court an application which complies in form and content with the provisions of title 11 governing applications for allowances under such a title. A copy of such application shall be served upon SIPC when filed. The court shall fix a time for a hearing on such application, and notice of such hearing shall be given to the applicant, the trustee, the debtor, the creditors, SIPC, and such other persons as the court may designate, except that notice need not be given to customers whose claims have been or will be satisfied in full or to creditors who cannot reasonably be expected to receive any distribution during the course of the liquidation proceeding.

(C) Recommendations of SIPC and awarding of allowances

Whenever an application for allowances is filed pursuant to subparagraph (B), SIPC shall file its recommendation with respect to such allowances with the court prior to the hearing on such application and shall, if it so requests, be allowed a reasonable time after such hearing within which to file a further recommendation.

In any case in which such allowances are to be paid by SIPC without reasonable expectation of recoupment thereof as provided in this chapter and there is no difference between the amounts requested and the amounts recommended by SIPC, the court shall award the amounts recommended by SIPC. In determining the amount of allowances in all other cases, the court shall give due consideration to the nature, extent, and value of the services rendered, and shall place considerable reliance on the recommendation of SIPC.

(D) Applicable restrictions

The restrictions on sharing of compensation set forth in section 504 of title 11 shall apply to allowances.

(E) Charge against estate

Allowances granted by the court, including interim allowances, shall be charged against the general estate of the debtor as a cost and expense of administration. If the general estate is insufficient to pay allowances in whole or in part, SIPC shall advance such funds as are necessary for such payment.

. . . . .

**78fff(b). Application of Title 11**

To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11. For the purposes of applying such title in carrying out this section, a reference in such title to the date of the filing of the petition shall be deemed to be a reference to the filing date under this chapter.

The statutory provisions under which Bazelon originally made its claims are the general Bankruptcy Code provisions relating to administrative expenses which provide, in pertinent part, at 11 U.S.C. §§ 503(a), (b)(1)(A), (b)(3)(D), (b)(4), as follows:

**§ 503. Allowance of administrative expenses**

(a) An entity may file a request for payment of an administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;

. . . . .

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

. . . . .

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 or this title;

. . . . .

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

. . .

In its Pre-trial Brief, SIPC argued, consistent with one of this court's grounds for denying the Reed Application, that 11 U.S.C. § 503(b), on which that Application was based, did not apply to SIPA proceedings. Further, SIPC noted that, if it did apply, §§ 503(b)(3)(D) and 503(b)(4), the only provisions allowing a general or other creditor (or its counsel) to receive compensation of fees and reimbursement of costs from a debtor's estate, were limited in application to Chapter 9 or Chapter 11 cases. A SIPA proceeding is conducted in accordance with Chapter 7 of the Bankruptcy, 15 U.S.C. § 78fff(b), not Chapters 9 or 11. Thus, as in a Chapter 7 bankruptcy case, see *Beck Rumbaugh Asso-*

*ciates, supra,* 84 B.R. at 371, compensation under § 503(b)(3)(D) could not be recovered by Bazelon.

In its Pre-trial Brief, filed on the date of the hearing of November 4, 1993, and submitted in response to SIPC's pre-trial submission, Bazelon completely changed its legal approach. Not only did it abandon § 503(b) as the basis of its Application, in favor of § 78eee(b)(5)(C) of SIPA (hereinafter "(5)(C)"), but it contended that the Bankruptcy Code had no relationship whatsoever to this provision of SIPA.

In its opening Post-trial Brief, Bazelon also argued that (1) this court should pay no deference to SIPC's recommendation that its application be denied, despite the language of (5)(C) stating that this court "shall place considerable reliance" on SIPC's recommendation, because SIPA's analyses were marred by an errors of law; (2) Bazelon was responsible for the filing of the SIPA proceeding, the tolling of the statute of limitations as to the Trustee's claim against National, and the theory which led to success in the Trustee's action against Newbridge. Finally, Bazelon advanced the "common fund doctrine" as an alternative basis for its recovery.

SIPC and the Trustee both filed Briefs in support of their opposition to Applications I and III. SIPC's Brief contained a detailed history on the amendments to SIPA and its analysis of the purposes or goals of the amendments. Based upon its contribution to the amendments, the legislative history, and its intimate role with the implementation of SIPA, SIPC asserted that §§ 78fff(b) and 78eee(b)(5)(D) obliged us to read SIPA as incorporating the requirements of § 503(b) within it. SIPC did not contend, however, that any professionals other than a trustee and the trustee's counsel were precluded, by reason of §§ 78eee(b)(5)(A) and (b)(5)(B), from receiving compensation, as the court had suggested was a possible reading of these sections of SIPA, taken together. In the course of the hearing on November 4, 1993, SIPC rebutted the Customers' suggestion that SIPC itself directly, rather than the Debtor's estate, would be the payor of any sum allowed. It also disputed Bazelon's as-

sertions that the Motion for joint administration benefitted the Debtor, and vigorously denied that any actions of Bazelon prompted the filing of the SIPA proceeding. Finally, SIPC disputed the applicability of the "common fund doctrine."

The Trustee's Brief opposed any award to Customers on the basis that the general estate had received no benefit from the activities for which the Customers sought compensation. Noting that the actions taken by Customers did not provide any funds which would be distributed to the general creditors of the estate, the Trustee argued that the only creditor-beneficiaries of Bazelon's services were the Customers themselves and other similarly-situated alleged . customers. The Trustee thus concluded that, except for its services on the Motion and in the *PO II* Case, the latter for which it was already agreed that they would be compensated, the Customers merely tagged along with actions prosecuted by the Trustee. The Trustee also asserted that the Creditors' demands upon him to complete the claims process had no impact upon him and the administration of the Debtor's estate except to serve as a bothersome distraction. He claimed to have attained a very favorable result for the Customers exclusively by means of his own patience and/or skillful negotiation with SIPC.

In the Reply Brief filed by Customers, they re-emphasized that SIPC itself had benefitted from their services, and therefore should be obliged to compensate them accordingly. They further disputed the Trustee's assertion that measuring the benefit to the Debtor's general estate was the proper analytical focus. They also contended that § 78eee(b)(5)(D) was significant in the statutory interpretation process, but that it supported their position that most references to the Bankruptcy Code pertained only to the procedures set forth therein, not its substantive law provisions. Finally, several bankruptcy cases employing the "common fund

doctrine" were cited to support this doctrine as an alternative basis for relief.

## D. DISCUSSION

### 1. THE CONTROLLING "AMERICAN RULE" LIMITS THE CUSTOMERS TO ONLY THOSE FEES EXPRESSLY AUTHORIZED BY STATUTE

The foregoing descriptions of the positions of the parties and the changes in the positions of the Customers themselves have resulted in a veritable cacophony of arguments regarding even the most basic concepts and statutes applicable to the matter before us. Our analysis must therefore commence with consideration of basic principles underlying requests of parties for payment of compensation to their counsel from opposing parties.

As an initial matter, we note that, in the United States, payment of compensation to another party's counsel is generally subject to the "American Rule." This "rule" provides that even successful litigants must generally bear the responsibility for payment of their own legal fees. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247–71, 95 S.Ct. 1612, 1616–29, 44 L.Ed.2d 141 (1975); *Securities & Exchange Comm'n v. Aberdeen Securities Co.*, 526 F.2d 603,· 607 (3rd Cir.1975); and *In re Barrett*, 136 B.R. 387, 394 (Bankr.E.D.Pa.1992). The only exceptions to the "rule" are thusly summarized in *Aberdeen Securities, supra*, 526 F.2d at 607 n. 9:

> (1) a contract or statute granting a right to attorney's fees; (2) the conferring of a common benefit by the recovery of a fund or property; (3) willful disobedience of a court order; or (4) a finding that the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons.

The exceptions invoked by the Customers are that a statute, now asserted to be (5)(C), expressly grants them this right and, secondarily, that they have conferred a common benefit by recovery of a fund, *i.e.*, the "common fund doctrine." [1.]

---

1. We note that the instant Applications are being pursued on behalf of the Customers rather than Bazelon itself. In a letter of January 13, 1994, Bazelon advises that it intends to distribute all of any recovery on the Application to the Customers

*pro rata*, as Bazelon itself has been paid $520,-733.37 for its services in this matter by the Customers. The Customers claim that they have not, in any of their Applications, requested compensa-

■ There are several principles of statutory interpretation of provisions of the Bankruptcy Code relative to requests for compensation by professionals which we believe are applicable here, irrespective of the significance of the role which we find that the Bankruptcy Code plays in interpretation of SIPA. The first is that, in keeping with the American Rule, the shifting of the counsel fees incurred by one party to another is permissible only where an applicable statute "clearly and specifically" authorizes such fee shifting. *See In re J.E. Jennings, Inc.,* 67 B.R. 106, 109–10 (Bankr.E.D.Pa.1986), *rev'd on other grounds,* 96 B.R. 500 (E.D.Pa.), *principle restated on remand,* 100 B.R. 749, 751–52 (Bankr.E.D.Pa.1989). *Accord, In re Automotive Nat'l Brands, Inc.,* 65 B.R. 412, 415 (Bankr.W.D.Pa.1986); and *In re Capitol Chip Co.,* 19 B.R. 262, 263 (Bankr.D.Hawaii 1982) ("The general policy of the [Bankruptcy] Act denies compensation unless expressly provided.").

■ The second principle is that, if the statute in issue does not expressly provide for same, the equities in favor of the party seeking compensation, even when aided by a broad statutory grant of residual equitable powers to the court as is provided in 11 U.S.C. § 105(a) of the Bankruptcy Code, cannot support the granting of compensation from other interested parties or the Debtor's estate. *See In re Oxford Management, Inc.,* 4 F.3d 1329, 1334 (5th Cir.1993); and *In re Fesco Plastics Corp.,* 996 F.2d 152, 157–58 (7th Cir.1993). *See also In re St. Mary Hospital,* 97 B.R. 199, 205–06 (Bankr.E.D.Pa. 1989), *aff'd,* 120 B.R. 25 (E.D.Pa.1990), *aff'd,* 931 F.2d 51 (3rd Cir.1991) ("vigorous and effective" counsel for alleged creditors was denied compensation from the debtor's estate because they lacked "creditor" status).

We therefore conclude the Customers initially bear the heavy burden of establishing that the pertinent statute(s) expressly authorize the compensation which they seek. They must then convince this court, under the standards provided for in the statutes in issue, which they can scarcely expect to be interpreted in a manner charitable to their cause, that they are entitled to compensation.

tion for services performed in furtherance of

**2. WHILE SIPA CONTROLS THE ISSUE OF WHEN COMPENSATION MAY BE GRANTED TO PARTIES SITUATED AS ARE THE CUSTOMERS, THE APPLICABLE STANDARDS FOR ALLOWANCE OF COMPENSATION MUST BE BORROWED FROM THE BANKRUPTCY CODE, WHICH SIPA LIBERALLY REFERENCES**

■ We agree with the Customers' ultimate contention, which is in notable contrast to their initial attempt to base their Applications solely on 11 U.S.C. § 503(b) of the Bankruptcy Code, that applications for compensation such as theirs must be determined exclusively under (5)(C) of SIPA. However, we disagree with their contention that the standards for determining their rights to compensation under (5)(C) must be determined apart for any reference to the standards provided for and developed over the years under the Bankruptcy Code. Rather, we find, in the accompanying provisions of SIPA and the choice of language in (5)(C) itself, that a clear Congressional intent to incorporate the established principles of the Bankruptcy Code is expressed.

The clearest statement of this principle appears in § 78fff(b), where it is stated that, to the extent possible, a SIPA proceeding is to be conducted "as though it were being conducted under Chapter 1, 3, and 5 and subchapters I and II of Chapter 7 of title 11," the Bankruptcy Code. Interpreting this SIPA provision, the court in *In re Investment Bankers, Inc.,* 4 F.3d 1556, 1564 (10th Cir.1993), states that

[t]his provision indicates that Congress intended SIPA liquidation proceedings to be treated, in most important respects, identical to a traditional bankruptcy case under title 11. *See In re Government Securities, Corp.,* 972 F.2d 328, 330–31 (11th Cir. 1992).

Moreover, references in SIPA to the Code abound. In § 78eee(b)(5)(B), it is stated that a fee application must comply "in form and content" with the provisions of title 11. In

individual Customers' claims.

§ 78eee(b)(5)(D), the provisions of the Bankruptcy Code regarding sharing of compensation, set forth in 11 U.S.C. § 504, are incorporated by reference. Finally, the operative language of (5)(C) itself, requiring the court to duly consider "the nature, extent, and value of the services," is almost identical with the language of 11 U.S.C. § 503(b)(4), which requires that reasonable compensation be based on "the nature, the extent, and the value" of the services in issue.

Considering that the authorities construing the Bankruptcy Code should be utilized to determine what standards apply to a fee application filed under SIPA is not to say that we believe that all of the restrictions of the Code must be read into SIPA. This is what SIPC suggests in arguing that the reference to § 504 of the Code in § 78eee(b)(5)(D) establishes that Congress intended to totally incorporate § 503(b) into (5)(C). This argument is not convincing. If Congress intended to incorporate § 503(b) *in toto* into (5)(C), as it did the limited aspect of § 504, it proved, in drafting § 78eee(b)(5)(D), that it knew how to do so.

■ However, this is also not to say, as the Customers argue, that only the "procedural" aspects of the Code regarding compensation of professionals are incorporated into SIPA. While the language of § 78eee(b)(5)(B) expressly incorporates the procedural aspects of compensation applications under the Bankruptcy Code into SIPA, the provisions of § 78fff(b) and the borrowing of the language of § 503(b)(4) in the drafting of (5)(C) itself convince us that the standards established under the Code for compensation applications, if not all of the Code's specific restrictions, should be liberally borrowed in interpretation of (5)(C) as well.

Even if, as the Customers state in their Reply Brief, all of the parties agree that § 78eee(b)(5)(D) is "of great importance" in interpretation of (5)(C), we beg to differ. That provision of SIPA refers only to sharing of compensation, which is not an issue in the instant fee Applications.

3. *RECOVERIES OF COMPENSATION BY CUSTOMERS OF A TARGET OF A SIPA PROCEEDING ARE POSSIBLE, ALTHOUGH DEFERENCE MUST BE ACCORDED TO SIPC'S RECOMMENDATIONS IN ALLOWING SUCH RECOVERIES*

■ In the course of the November 4, 1993, hearing, this court suggested that § 78eee(b)(5)(B) and, consequently, (5)(C) which incorporates it, could be read as precluding grants of compensation to any professionals except those expressly referenced in § 78eee(b)(5)(A), *i.e.,* the trustee and the trustee's counsel. However, SIPC itself did not suggest this interpretation. Rather, it conceded that the broad reference to "[a]ny person seeking allowances" in § 78eee(b)(5)(B) expressed an intention to extend compensation to any other parties eligible to obtain same under the terms of the statute. Indeed, as the Customers point out, the Receiver and an accounting firm hired by the Trustee, both of which were awarded compensation upon the recommendation of SIPC, were not parties strictly within the scope of § 78eee(b)(5)(A), either.

■ We believe that it is significant that SIPC itself refused to limit the scope of professions entitled to compensation under (5)(C) to the Trustee and the Trustee's counsel. We believe that we must confer "considerable reliance on the recommendation of SIPC," as (5)(C) directs, especially when SIPC concurs with an argument which is not in its own self-interest. *See* pages 252–54 *infra.* Therefore, we conclude that the Customers could be "persons" entitled to compensation under §§ 78eee(b)(5)(B) and (C).

We also reject SIPC's arguments, in its Pre-hearing Brief, that the Customers are confined to raising a claim under § 503(b)(3)(D) under the Code; § 503(b)(3)(D) does not apply to Chapter 7 cases; and, that since, per § 78fff(b), a SIPC proceeding is conducted like a Chapter 7 case, the Customers are precluded from recovery. Every SIPA proceeding is to be conducted like a Chapter 7 bankruptcy case. *Id.* Therefore, the terms of § 503(b)(3)(D), if applied in this sense, would preclude credi-

tors like the Customers from recovery of compensation in *every* SIPA case. If Congress meant to preclude recovery of compensation by all creditors in every SIPA case, we believe that it would have said so, as opposed to so effecting this result in a roundabout fashion, per the incorporation of the specific requirements of § 503(b)(3)(D).

However, we disagree with the Customers' contention that we should give no deference to SIPC's recommendation that the Customers should receive no compensation. The Customers appear to argue that SIPC's views as to not only the applicable law and standards, but also its rendering of factual findings, is not contemplated by that language of (5)(C) which requires this court to "place considerable reliance on the recommendation of SIPC." Rather, they contend that SIPC's role is relegated to making a recommendation only after the applicable law and standards and the relevant findings of fact have been rendered by the court.

█ We agree that SIPC, as a non-profit corporation funded principally by assessments of its members, *see* 15 U.S.C. §§ 78ccc(a)(1), 78ddd(c)(1), is not a governmental agency. *See* § 78ccc(a)(1)(A). Therefore, it cannot take advantage of the implicit deference which must be accorded to federal agencies' interpretations of their own pertinent statutory schemes and operative administrative regulations. *Compare Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); and *Air Courier Conference of America/Int'l Committee v. U.S. Postal Service,* 959 F.2d 1213, 1223 (3rd Cir.1992).

On the other hand, the SIPC fund is a "quasi-public fund." *Securities & Exchange Comm'n v. Packer, Wilbur & Co.,* 498 F.2d 978, 983 (2d Cir.1974). SIPC is the entity which is statutorily obliged to reimburse the estate of broker dealers for certain claims of customers. *See* 15 U.S.C. § 78fff–3(a); and *In re G.V. Lewellyn & Co.,* 140 B.R. 502, 507 (Bankr.S.D.Iowa 1992). It is therefore not a totally private body, entirely independent from governmental attachment.

Moreover, Congress has specifically decreed that considerable deference to SIPC's recommendations must be given, especially in a case in which, as here, the payment of compensation to professionals is ultimately funded by SIPC itself. *See In re Bell & Beckwith,* 112 B.R. 876, 878 (Bankr.N.D.Ohio 1990) (SIPA requires a court to allow the amount of fees and expenses recommended by SIPC and precludes a reduction of same by a court when there is no reasonable expectation of recoupment); and *In re First State Securities Corp.,* 48 B.R. 45, 46 (Bankr. S.D.Fla.1985) (court chafes under, but adheres to, the language of (5)(C) requiring adherence to recommendations of SIPC which are consistent with fee requests when there is no reasonable expectation of SIPC's obtaining reimbursement).

█ We perceive no reason to curtail this deference to SIPC to the limited role to which the Customers would confine it, *i.e.,* commentary only after the court has made its relevant findings of fact and conclusions of law. It is difficult for us to understand how SIPC could make a meaningful recommendation after the court has made relevant findings. Rather, we believe that Congress intended that the courts seek out the views of SIPC as to the applicable law and the operative facts at every juncture, and that the court should give its opinions deference on all points. Its views are, per (5)(C), conclusive, if SIPC has no objection to the professional's request for compensation in an estate which, like the Debtor's estate, is likely to contain no surplus, since it will be obliged to reimburse the estate itself for all of its expenditures on account of customer property claims. On the other hand, the statutory scheme also contemplates deference to the SIPC's views when requests for compensation are made of which it does not approve, since it is footing the bill.

█ Deference to SIPC's views does not mean automatic adherence to its views. As is indicated, our ultimate interpretation of the law and application of the instant facts thereto is in many respects divergent from that recommended by SIPC. However, given the deference due to SIPC's views, we are reluctant to totally reject any of its pertinent positions.

4. *THE STANDARDS APPLICABLE TO SIPA COMPENSATION AWARDS TO CREDITORS MUST BE BORROWED FROM THE BANKRUPTCY CODE, PARTICULARLY § 503(b) AND § 506(c) THEREOF*

We have now determined that we can allow compensation to the Customers only if such is specifically allowed by statute or in accordance with the "common fund doctrine." For the present, we will put aside the "common fund doctrine," and address it after the potential statutory basis for compensation is totally explained. *See* pages 258–59 *infra.* We have determined that we must borrow, to the extent possible, the concepts developed in interpreting the Bankruptcy Code in determining the standards application to SIPA compensation awards. We have rejected readings of the application of the Bankruptcy Code which would make it impossible for parties situated like or similar to the Customers to ever recover compensation from the Debtor's estate, although we have recognized our need to grant broad deference to the· views of SIPC in such matters. The question remaining is what Bankruptcy Code sections we should look to for determining the applicable standards, and what the standards articulated in those Code sections are.

One obvious point of reference is 11 U.S.C. § 503(b) of the Code, since this is the section of the Code that pertains to allowances of administrative expenses, including compensation of professionals. Section 503(b), particularly § 503(b)(3)(D), specifically allows any creditors of a debtor's estate to recover compensation for, *inter alia,* their counsel's services, but only in very narrowly-defined circumstances. From our foregoing discussion, at pages 252–53 *supra,* we have rejected the application of one aspect of § 503(b)(3)(D), *i.e.,* its inapplicability to Chapter 7 liquidation cases. However, we find that it is logical to apply the other, more general standards of § 503(b)(3)(D) to SIPA proceedings.

This court has not infrequently discussed the standards which have been deemed applicable to § 503(b)(3)(D) motions, most recently in *In re Lease–A–Fleet, Inc.,* 148 B.R. 419,

426–27 (Bankr.E.D.Pa.1992); and *In re FRG, Inc.,* 124 B.R. 653, 658 (Bankr.E.D.Pa.1991). In *FRG,* at *id.,* we stated that

[t]he criteria which must be satisfied to allow a recovery under § 503(b)(3)(D) are that the services for which compensation is sought must have benefitted the estate itself or all parties in the case; must have had a direct, significant, and demonstrable positive effect upon the estate; and must not have been duplicative of services performed by others. *See, e.g., In re Washington Lane Associates,* 79 B.R. 241, 243–44 (Bankr.E.D.Pa.1987); *In re Paolino,* 71 B.R. 576, 579–80 (Bankr.E.D.Pa.1987); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 565–69 (Bankr.D.Utah 1985); *In re Richton International Corp.,* 15 B.R. 854, 855–56 (Bankr.S.D.N.Y.1981); and G. Johnson, *Recovering a Creditor's Expenses and Legal and Accounting Fees as an Administrative Claim,* 5 BANKR. DEV.L.J. 463, 483 (1988).

In *Lease–A–Fleet, supra,* while reiterating much of what was said in *FRG,* we noted the following

special factors which will preclude the allowance of such claims. One of these factors is when the payments made by a claimant are in its own "self interest." Self-interest is found to exist where the expense at issue was incurred primarily for the benefit of the creditor and provided only an incidental benefit to the estate. The presence of self-interest mandates denial of a § 503(b)(3)(D) claim. *See . . . In re Leedy Mortgage Co.,* 111 B.R. 488, 492–93 (Bankr.E.D.Pa.1990) (costs of assembling debtor's records served mostly interests of creditors, not those of the debtor); . . . Although a § 503(b)(3)(D) claimant must perform a service not already being performed by the debtor or other interested parties, the claimant cannot supplant the debtor's role unless it shows that the debtor is unable or unwilling to act. *See [In re] Ace Finance, [Co.], supra,* 69 B.R. [827,] at 831 [ (Bankr.N.D.Ohio 1987) ]; and *In re Rockwood Computer Corp.,* 61 B.R. 961, 965–66 (Bankr.S.D.Ohio 1986).

These authorities interpreting § 503(b)(3)(D) focus, as the Trustee suggests,

upon the benefit that the services performed by the creditors' professionals conferred upon the Debtor's general estate. However, in light of the unique role that SIPC plays in SIPA proceedings, we believe that there is another Code section which can serve as a reference point in establishing standards to determine whether the Customers should be entitled to compensation in the instant Applications, namely 11 U.S.C. § 506(c), which provides as follows:

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Section 506(c) provides a means by which an administrative creditor, such as counsel for an interested party in a bankruptcy case, can obtain reimbursement for its efforts which have the effect of benefitting or preserving the collateral of a secured creditor. See In re McKeesport Steel Castings Co., 799 F.2d 91, 94 (3rd Cir.1986); and In re Cann & Saul Steel Co., 86 B.R. 413, 415–16 (Bankr. E.D.Pa.1988).

We recognize that SIPC is not a creditor of the Debtor, and that the Customers have no rights to any direct recoveries against SIPC regarding their customer claims arising from the Debtor's case. See Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 418–25, 95 S.Ct. 1733, 1737–41, 44 L.Ed.2d 263 (1975); and Securities Investor Protection Corp. v. Ambassador Church Finance/Development Group, Inc., 788 F.2d 1208, 1210 (6th Cir.), cert. denied sub nom. Pine St. Baptist Church v. Securities Investor Protection Corp., 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986). However, SIPC is obliged to advance to the Debtor's estate amounts necessary to fund certain customers' claims, see 15 U.S.C. §§ 78fff–3(a), (b)(2), and it retains a right to be reimbursed for these advances from the Debtor's estate. See 15 U.S.C. § 78fff(e); and Lewellyn, supra, 140 B.R. at 507.

Therefore, the relationship between the Customers, who claim to have benefitted SIPC by effecting collection of assets of the Debtor's estate; and SIPC, as alleged beneficiary of the Customers' actions, is analogous to the relationship between an administrative creditor of a debtor's estate and a secured creditor of the estate who is the beneficiary of the administrative creditor's actions. While the analogy may not be perfect, we believe that it is close enough to allow us to borrow from the caselaw interpreting § 506(c) to establish the standards upon which we can determine whether the Customers are entitled to a recovery against the Debtor's estate which will ultimately inure solely to the benefit of SIPC.

In such cases as In re Orfa Corp. of Philadelphia, 149 B.R. 790, 798–99 (Bankr. E.D.Pa.1993); and Cann & Saul, supra, 86 B.R. at 418, we have articulated the standards for allowance of § 506(c) motions. Therein, we have held that the § 506(c) movant must prove that it satisfies either the "objective test" of proving direct, actual benefit to the collateral in issue or the "subjective test" of establishing that the secured creditor consented to the performance of services on its behalf. Refining those standards to meet the instant fact situation, we conclude that the Customers must prove that their services provided actual, direct benefit to SIPC or that SIPC consented to same in order for them to recover compensation under (5)(C) of SIPA.

We therefore conclude that if and only if the Customers are able to satisfy the criteria of either § 503(b)(3)(D) or § 506(c) can they succeed on either Application I or Application III.

5. *THE CUSTOMERS ARE ENTITLED TO A RECOVERY FROM SIPA ONLY AS TO THEIR SERVICES ON THE JOINT ADMINISTRATION MOTION*

We now face the task of applying the standards which we have established at pages 258–59 *supra* to the instant facts, as established in Applications I and III, their profuse exhibits, and at the hearing of November 4, 1993.

The first "service" for which the Customers seek compensation is bringing about the filing of the instant SIPA proceed-

ing. This claim is very difficult for us to conceptualize. As is noted by SIPC in its submissions, there are no statutory provisions allowing for investigation by SIPC of complaints of customers of broker dealers. Rather, SIPC is required to follow the directives of the SEC in instituting proceedings under SIPA, and it relies upon the SEC to investigate the need for such a liquidation proceeding. *See Barbour, supra,* 421 U.S. at 415–18, 95 S.Ct. at 1736–38. Therefore, since SIPC was not responsible for the investigation which must precede the initiation of this proceeding, nor the decision to initiate it, it is difficult for us to understand how SIPC could be deemed responsible for belated initiation of this proceeding. In any event, we have great difficulty with the general concept that a person who makes a complaint to a governmental agency (the SEC) which brings about administrative action on the complaint can expect compensation for this action.

Second, it is not clear that the instant Customers, as opposed to other similarly-situated customers, caused the initiation of this proceeding. The parties appear to agree that the SEC's receipt of the complaint of Mary Simonetti, who was apparently not a client of Bazelon and therefore not one of the Customers, triggered the action. Certainly, without witnesses from the SEC, we could do little but speculate as to what actually caused the SEC to request SIPC to initiate this proceeding.

■ Third, the activities which brought about the filing of this proceeding were obviously not actions taken by the Customers after or during the proceeding, but actions taken before it was commenced. It is only *post-filing* services and expenditures, in the course of the proceeding itself, and not services performed prior thereto, that can be compensated as administrative claims. *See, e.g., In re Hemingway Transport, Inc.,* 954 F.2d 1, 5 (1st Cir.1992); *In re New York Trap Rock Corp.,* 137 B.R. 568, 572 (Bankr. S.D.N.Y.1992); and *In re Philadelphia Mortgage Trust,* 117 B.R. 820, 828–30 (Bankr. E.D.Pa.1990).

Finally, assuming *arguendo,* that the Customers' actions did bring about the filing of this proceeding, which we doubt, it is apparent that such services would not meet the standards of either § 503(b)(3)(D) or § 506(c) of the Bankruptcy Code. The only beneficiaries of the filing of this proceeding were the Customers themselves and others similarly situated. As the Trustee points out, there are no funds in the general estate, and therefore no general creditors have benefitted from this proceeding. Thus, the standards of § 503(b)(3)(D), which require a benefit to a debtor's general estate, cannot be satisfied. Similarly, it is difficult to perceive any benefit to SIPC, as is required under § 506(c), from the filing of this proceeding. Clearly, the Customers are unable to meet the "subjective test" of § 506(c), since SIPC never requested any action on their part or consented thereto. As to the "objective test," the only direct impact of the Customers' actions upon SIPC was obliging it to pay considerable sums to the Debtor's estate to satisfy the allowed Customers' claims. Creating such obligations for it is not in any sense a benefit to SIPC.

■ The second classification of services for which compensation is sought in Application III pertains to the Customers' participation as intervenors in the suits brought by the Trustee against National, Newbridge, and the Banks. It is certainly true that the Customers were vigorous participants in these legal actions and that they occasionally proffered witnesses, documents, and legal argument which was helpful to the Trustee. However, this court must observe that the Trustee alone had the responsibility to file these actions and could not be supplanted by the Customers unless he refused to act, which occurred only in reference to the *PO II* Case. Furthermore, the Trustee filed and retained very competent control over the filing, litigation, and trial of these proceedings. For the most part, we find that the Customers have exaggerated the importance of their participation in these proceedings.

The Customers claim that their filing of the *Deamer* action tolled the statute of limitations which would otherwise have run against the Trustee as to his causes of action against Newbridge and the Banks. They also contend that Bazelon's sending a demand letter to National was a timely notice

to National of the Customers' claims which was crucial to that decision in the Trustee's favor.

The overarching difficulty with these arguments is that, like the matters relating to the filing of the SIPA proceeding, they pertain only to actions taken by the Customers prior to the filing of the SIPA proceeding, rather than constituting services performed in the course of the instant SIPA proceeding or the related adversary proceedings. As we noted at page 256 *supra*, such services are, for that reason, not classifiable as administrative claims, and hence could not serve as the basis for claims under either § 503(b) or § 506(c) of the Bankruptcy Code. Actions taken by the Customers in connection with the *Deamer* Case or other related litigation are properly collectable from the courts which heard those cases, not this court. *Cf. In re Vasseli*, 5 F.3d 351 (9th Cir.1993) (bankruptcy court does not have authority to award attorneys' fees for services performed in the district court on appeal).

There are other reasons why this class of claims would be barred under §§ 503(b)(3)(D) and 506(c). The first is that it is not clear what actual benefit resulted to any party, even the Customers themselves, as a result of Customers' participation in these lawsuits. The Trustee's competent handling of these cases, it appears to us, would have sufficed to net all or most of the recoveries garnered. To a large degree, the services performed by Bazelon were duplicative of the actions of the Trustee's counsel.

It is not at all clear to us that the broad language of 11 U.S.C. § 108(a) would not have preserved the timeliness of the Trustee's claims against Newbridge and the Banks, without the presence of the *Deamer* Case filing. The Customers have cited a few cases which have refused to apply § 108(a) to preserve trustee's actions under 11 U.S.C. § 544(b), *e.g., In re Hansen*, 114 B.R. 927, 932 (Bankr.N.D.Ohio 1990); and *In re Radcliffe's Warehouse Sales, Inc.*, 31 B.R. 827, 830–32 (Bankr.W.D.Wash.1983). The instant adversary proceedings were not, however, initiated under § 544(b); neither Newbridge nor the Banks argued that § 108(a) did not apply; and this court has construed § 108(a)

broadly in the recent past. *See In re Lease–A–Fleet, Inc.*, 155 B.R. 666, 670 (Bankr. E.D.Pa.1993); *In re Shields*, 148 B.R. 783, 786 (Bankr.E.D.Pa.1993); and *In re Numedco, Inc.*, 1991 WL 204908, slip op. at *1 (Bankr.E.D.Pa. Oct. 7, 1991).

Relevant once again, in reference to § 503(b)(3)(D), is the observation that the general creditors of the Debtor's estate did not benefit from any of the Customers' actions. The Customers were clearly acting in their own self-interest in participating in these proceedings, and their claims alone were paid from the recovered proceeds, or as a result of SIPC's recovery of those proceeds.

Were the Customers able to convince us that their actions in the adversary Proceedings against Newbridge, National, and the Banks were in fact significant in achieving the favorable results, we could conceivably award them benefits under SIPA because such benefits would have been collectable under the standards set forth in § 506(c). The "subjective test" is not satisfied, because SIPC did not request nor encourage the Customers' participation. However, the "objective test" could conceivably have been satisfied, because SIPC did benefit from the presence of these proceedings. The dollars reaped from their success were dollars which SIPC was not obliged to pay, from only its own assets, to fund the customers' claims. Our reason for denying these claims, in addition to the pre-filing performance of many of the services which serve as their basis, is that we do not believe that the Customers' legal services in the course of litigation of these proceedings were significant to their success, as were, for example, their services in the *PO II* Case. Especially when adding to the balance the deference which we must pay to SIPC's recommendations that no compensation is due to the Customers or their counsel, we are not prepared to award them anything for these services.

 Third, the Customers seek compensation for their role in the Trustee's recommendation of their claims for full payment. In light of our previous discussion, it is plain to see why such claims are not compensable under SIPA. First, we doubt that the Cus-

tomers' prodding either prompted a favorable decision or significantly speeded the process. The Trustee and ultimately SIPC were obliged to decide how to rule on the Customers' claims in their own discretion. There is no firm indication that they were swayed by the actions of the Customers in so doing. This court was committed to speeding the process of administration, irrespective to the motions of these Customers and several others similarly situated to require the Trustee to act expeditiously.

Even if it could be argued that, at least psychologically, the Customers' vigorous presence effected suasion on their behalfs, these claims must clearly be denied as a basis for recovery from the Debtor's estate or SIPC for another reason. These actions resulted in no benefit to any parties but the Customers themselves. They were taken with self-interest clearly in mind. No § 503(b)(3)(D) claim for such services could therefore be made, nor can a § 506(c) based argument be made, because SIPC in no way benefitted from its agreement to pay more to the Customers than it might otherwise have been inclined to do. Its payments clearly resulted in a diminution of its assets.

■ The only services performed by Bazelon on behalf of the Customers which this court believes are properly compensable under SIPA are those in furtherance of the Motion to jointly administer the SIPA proceeding with the IBEX Cases set forth in Application I. Unlike the prior actions in issue, with the exception of their prosecution of the *PO II* Case, for which they were duly compensated, there is no question that the Customers alone initiated the matter. While it still remains impossible to include these services within the scope of § 503(b)(3)(D), because no general creditors of the Debtor benefitted therefrom, it is not difficult to bring them within the standards of the "objective test" of § 506(c). Both SIPC and the Trustee vigorously opposed the Motion. Only other customers joined in its support. However, Bazelon clearly performed most of the relevant services. Joint administration of the SIPA proceeding and the IBEX Cases ultimately provided demonstrative benefit to SIPC because it prevented SIPC from being

forced to bear the cost to compensate the Receiver and his counsel, as well as the Trustee and his counsel.

We have carefully reviewed Application I, which demands compensation for Bazelon's services and costs in connection with the Motion in the total amount of $22,120.25. We believe that the compensation requested is very liberal for prosecution of a single motion. However, we will disallow only $1,035.00 of the sums specifically requested, for various reasons noted by us directly on the original file copy of Application I. We will therefore award the Customers and Bazelon $21,085.25 for these services.

6. *THE CUSTOMERS ARE NOT ENTITLED TO COMPENSATION ON THE BASIS OF THE "COMMON FUND DOCTRINE"*

■ As we noted, quoting *Aberdeen Securities, supra,* at page 17 *supra,* another exception to the American Rule, otherwise precluding recovery of a party's own attorneys' fees and costs from another party, in addition to the presence of a contract or statute providing a right to such fees, is the "common fund doctrine." In fact, in *Aberdeen Securities,* the court remanded that matter, a SIPA proceeding, to the district court to consider a claim made by counsel for certain customers under that very doctrine. 526 F.2d at 607.

The history, and the standards for the application, of "the common fund doctrine" are thusly articulated by the court in *Fesco Plastics, supra,* 996 F.2d at 157:

The common fund doctrine was first recognized by the Supreme Court in *Trustees v. Greenough,* 105 U.S. [15 Otto] 527, 26 L.Ed. 1157 (1881), and most recently discussed in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Essentially, the doctrine holds that "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing,* 444 U.S. at 478, 100 S.Ct. at 749. It is most appropriate when (1) the class of persons benefitted by the lawsuit is small and easily identifiable,

**259**

(2) the benefit can be traced with some accuracy, and (3) the costs of the litigation can be shifted accurately to those who profit by it. *Id.* [, 444 U.S.] at 478–479, 100 S.Ct. at 749–750, citing *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 265 n. 39, 95 S.Ct. 1612, 1625–26 n. 39, 44 L.Ed.2d 141 (1975). This is an equitable doctrine and is usually justified on the ground that it prevents unjust enrichment of the non-litigants, who have taken a free ride on the trailblazer's efforts. *Boeing,* 444 U.S. at 478, 100 S.Ct. at 749, *Mills v. Electric Auto–Lite,* 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970); *Gibbs v. Blackwelder,* 346 F.2d 943, 945 (4th Cir.1965). Jurisdiction over the fund enables a court to prevent such inequity by assessing fees out of the entire fund, spreading the burden proportionately among those benefitted. *Boeing,* 444 U.S. at 478, 100 S.Ct. at 749.

See also, e.g., *In re Texaco, Inc.,* 85 B.R. 934, 939–40 (Bankr.S.D.N.Y.1988).

Although the *Fesco Plastics* court ultimately rejects the notion that the common fund doctrine has any place in determining the compensation properly due to bankruptcy professionals in that case, other courts have allowed its application in bankruptcy cases in certain circumstances. *See In re Milton Poulos, Inc.,* 947 F.2d 1351, 1353 (9th Cir. 1991); and *In re Willis,* 143 B.R. 428, 433–34 (Bankr.E.D.Tex.1992).

In light of the holding of *Aberdeen Securities* that the common fund doctrine should be considered as an alternative basis for compensation of customers' counsel in a SIPA proceeding and our prior conclusion herein that we should be reluctant to borrow principles form the Bankruptcy Code which would result in a complete bar of compensation to customers' counsel in interpreting SIPA, we find that it would be inappropriate to apply the exclusionary result of *Fesco Plastics* in determining the allowability of the Applications at issue. In an appropriate setting, where the general requirements of the doctrine are satisfied, we hold that the doctrine could be successfully invoked by creditors' counsel in a SIPA proceeding to obtain compensation not otherwise obtainable.

The difficulty which we have in applying this doctrine in the Customers' favor in reference to Application III is identifying a "fund" "recovered" by the Customers or Bazelon on behalf of the Debtor's estate or SIPC. Apparently, the "fund" referenced by the Customers is the alleged approximately $2 million recovery of customer property distributed to the customers of the Debtor. However, this was a fund recovered on behalf of the Customers alone, not on behalf of the Debtor's estate or SIPC. The fund which should be assessed for this recovery is the amount to be distributed to the customers by the Trustee, and the payors should be all of the customers. Since the Customers have already compensated Bazelon for its efforts, *see* page 250 n. 1 *supra,* the proper target of such a request could only be the customer-claimants not represented by, or obliged to compensate, Bazelon. In no sense should SIPC, as the payee of the common fund, be liable to Bazelon or the Customers for any sum on the basis of this doctrine. *Accord, In re Chicago, M., St. P. & P. R.R.,* 840 F.2d 1308, 1318 n. 9 (7th Cir.1988) (the common fund doctrine cannot be applied to authorize payments from a bankruptcy estate). However, as we understand the Customers' argument relative to the Applications in issue, they are attempting to assess SIPC, and not other customers, under this doctrine.

Invocation of the common fund doctrine does not alter our previous determinations that (1) Bazelon's role in the litigation which generated the funds collected by the estate was not significant; and (2) in no sense can it be said that SIPC benefitted from its being convinced to make payments to the Customers. It is thus clear to us that the invocation of the common fund doctrine does not enhance the Customers' rights to make a recovery from SIPC in the Applications in question.

### E. CONCLUSION

An Order will be entered granting the Customers and Bazelon $21,085.25 on Application I, for bringing about the joint administration of the instant SIPA proceeding with the IBEX Cases. In all other respects, and as to Application III in its entirety, the re-

quests of the Customers and Bazelon will be denied.